TUCKER and KING, Respondents, v. DEERING
SOUTHWESTERN RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, November 5, 1908.

1. **CONTRACTS: Oral Contracts Reduced to Writing: Jury Question.** In an action for violation of an oral contract made by the plaintiffs with the agent of defendant, a corporation, where it was shown that a subsequent contract was written and signed by the plaintiffs and an agent of the defendants, subject to the approval of the defendant's superintendent and the said superintendent never approved said written contract, such written contract was never in fact entered into and whether or not there was a prior oral contract agreed upon should have been submitted to the jury under proper instruction.

2. ———: ———: ———. And in such case an instruction asked by the defendant authorizing a verdict for the defendant if plaintiff went to work under the written agreement and continued to work under it until notified that it was not approved by the defendant's superintendent then the plaintiff failed to make out a case, should have been given; if plaintiff went to work under the written memorandum which was not entered into, then he did not go to work under the alleged oral agreement sued on.

3. ———: ———: **Damages: Evidence.** In such case evidence that the plaintiffs incurred expense in procuring supplies and beginning the work, was inadmissible as too remote in an action for breach of the contract.

Appeal from Pemiscot Circuit Court.—*Hon. H. C. Riley,*
Judge.

REVERSED AND REMANDED.

*Oliver & Oliver, J. M. Blazer* and *Faris & Oliver* for appellant.

There is no proof, nor is there any contention, that the alleged oral contract made by Tucker (but not by King), with Pingle was ever ratified by the company. Unless it be held that Pingle was an agent whose powers as to the matters in issue were of a general character, the admission of this testimony was error.   R. S. 1899, sec. 974; Hardware Co. v. Grocer Co., 64 Mo. App. 677; Famous, etc., Co. v. Iron Works, 51 Mo. App. 66.

*Jere S. Gossom* and *B. A. McKay* for respondents.

Pingle was the general superintendent of defendant's railroad; he was placed in control of said railroad by defendants and permitted to manage its construction; he dealt with plaintiffs, who had no knowledge of want of authority, if any, on the part of Pingle. It makes no difference whether Pingle exceeded his authority under such circumstances. Rosenbaum v. Gilliam, 101 Mo. App. 126; Stripling v. Maguire, 108 Mo. App. 594; Holmes v. Board of Trade, 81 Mo. 137.

NORTONI, J.—This is an action for damages alleged to have accrued to the plaintiffs because of the defendant's breach of an oral contract providing for the construction of an embankment for a railroad. The plaintiffs recovered and the defendant appeals. The defendant is a railroad corporation existing under the laws of this State and owns and operates a short line of railroad in Pemiscot county in connection with its sawmills, for the purpose of conveying timber thereto. Henry Pingle was one of the directors of defendant railroad and its general superintendent. The defendant desired to extend its road a short distance and Mr. Pingle was clothed with authority to negotiate a contract therefor in its behalf. There are two plaintiffs to the action, Tucker and King. The original contract declared upon in the petition, however, is alleged to have been entered into by the plaintiff Tucker and the defendant's superintendent, Mr. Pingle. King subsequently came into the case as a partner of Tucker by the consent of the defendant's civil engineer, Mr. Randolph. As stated, the petition declares upon an oral contract and its breach. It is alleged in the petition substantially that the plaintiffs and defendant entered into an oral contract on December 27, 1903, wherein the plaintiffs agreed to clear the right of way and construct a roadbed for the defendant's railroad from the town of

Deering in Pemiscot county, to a point of intersection with the Paragould Southeastern Railroad in Dunklin county, Missouri, according to the specifications and plans furnished by the engineer of the defendant railroad company, in consideration whereof the plaintiffs were to receive the sum and price of twenty-five cents per cubic yard for construction, subject to ten per cent shrinkage for all team work and twenty per cent shrinkage for wheelbarrow and shovel work.  All stations on said road were to be completed consecutively and paid for as completed.    It is further alleged that all merchantable timber standing on the right of way was to be cut into saw stock by the plaintiffs, for which they were to receive a compensation of fifty cents per thousand; that the plaintiffs entered upon the work and performed every condition of the contract on their part until about January 21, 1904, when they were notified by defendant railroad company to desist from further prosecution thereof; that the defendant refused to permit them to further comply with the contract and earn large profits which would otherwise have accrued to them, etc.; and that they were damaged by reason of the defendant's breach of the contract mentioned in the sum of $9,774, for which they ask judgment.

The testimony on the part of the plaintiffs tended to prove that the plaintiff Tucker, a railroad contractor, had a conversation with defendant's superintendent, Pingle, on December 27, 1903, at the depot at Pascola while Mr. Pingle was awaiting a train.    The entire conversation consumed about twenty minutes time.    Tucker insists that he proposed to Pingle to clear the right of way, construct a roadbed, etc., at the price of twenty-five cents per cubic yard, subject to ten per cent shrinkage for team work and twenty per cent shrinkage for wheelbarrow and shovel work, and otherwise as declared in the petition; and further, that he would cut all merchantable timber on the right of way into saw stock at

fifty cents per thousand. He testified that Mr. Pingle accepted his proposition in every respect other than the price to be paid for cutting the merchantable timber into saw stock. This matter was left open temporarily with the understanding that Mr. Randolph, the defendant's civil engineer, would make some agreement on the part of the railroad with respect to the matter; that he should see Mr. Randolph and Randolph could reduce the contract to writing provided Tucker so desired. Tucker says he met Mr. Pingle a second time three or four days thereafter, upon which occasion Pingle accepted his proposition of fifty cents per thousand for cutting the merchantable timber into saw stock, thus completing the contract, and instructed him to move upon and commence the work. About this time Tucker moved his teams and equipment to the work and Superintendent Pingle introduced Tucker to those in charge of the company's store and commissary, giving instructions to the effect that Tucker was going to build the railroad and that they should let him have goods, supplies, etc. Thereupon Mr. Pingle departed for Chicago where he was detained by business for a number of days. In the interim, plaintiff Tucker, with the consent of the defendant's civil engineer Randolph, took the plaintiff King into the contract with him as partner. Tucker insists the oral contract as heretofore detailed was entirely completed between himself and Mr. Pingle prior to his associating King therewith, which was consented to by the defendant's civil engineer and not objected to thereafter by Pingle. About January 4, 1904, when King became associated with plaintiff Tucker as partner, he insisted upon having a written memorandum, at least, with respect to the matter and declined to proceed until such was had. Thereupon the two plaintiffs met the defendant's civil engineer, Mr. Randolph, during the period while Superintendent Pingle was detained in Chi-

cago, and entered into the following written memorandum, subject to the approval of Superintendent Pingle.

"Deering, Mo., Jan. 7, 1904.

"Agreement between the Deering Southwestern Railway and Wm. Tucker and D. King, to be known as Tucker & King.

"Whereas, it is agreed that in consideration of the sum of twenty-five (25) cents per cubic yard, to be paid by the said Deering Southwestern Railway, the said Tucker and King shall clear the right of way and build the roadbed for said road, according to grade and specifications furnished by the engineer. All stations to be completed consecutively, also shall receive the sum of fifty (50) cents per M. for all timber cut as saw stock and shall be merchantable timber, according to the orders of the timber foreman. This work shall be subject to a shrinkage discount of 10 per cent for team work and 20 per cent for barrow or shovel work, and shall be inspected and paid for as each station is completed as near as practicable.

"This agreement subject to the approval of the superintendent.

"DEERING SOUTHWESTERN RY.,
"By E. C. RANDOLPH, Eng.

"It is further understood and agreed that the men now engaged in station work shall continue at same as they may desire at the price of twenty (20) cents per cubic yard, and shall work under the supervision and contract of said Tucker & King, who shall furnish them station work on reasonable grounds.

"Signed:

"E. C. RANDOLPH,
"WM. TUCKER,
"D. KING."

Immediately thereafter, plaintiffs commenced operations on the roadbed.    They continued to prosecute the work for some days.    Pingle returned from Chicago January 18th, declined to approve the memorandum of the contract as drafted, and had one or two conversations with the plaintiffs concerning certain details about the distance they were to build the embankment, insisting that he had not agreed that it should be constructed by them to the Paragould Southeastern Railroad Company; and further, that certain stipulations should be contained therein concerning the payment of labor, etc., looking to the protection of the defendant against labor liens.    Plaintiffs declined to accede to Mr. Pingle's wishes in this behalf, and thereupon, on January 21st, he notified them to desist from further operations on the road.    The theory of the case as presented by the defendant is that no contract whatever was made with the plaintiff Tucker nor with Tucker and King.    Mr. Pingle, the superintendent, insists that the two conversations between him and Tucker had prior to his going to Chicago, were preliminary only and did not amount to a contract between them.    Mr. Pingle says there was no contract to build the road to connect with the Paragould Southeastern Railroad, which is a distance of about nine and one-half miles; that they contemplated a much shorter extension; and that the conversations were general only, with respect to how the work was to be done and the price to be paid.    On the defendant's theory of the case, it appears the contract was to be afterwards reduced to writing by the civil engineer, Randolph, and the plaintiffs, subject to the approval of Superintendent Pingle.    And therefore, the contract was never consummated for the reason Pingle declined to approve it because the plaintiffs would not stipulate as to the distance the road should be constructed and concerning the time and manner of payment, labor liens, etc.    It therefore appears

that defendant insists no contract whatever, either oral or written, was entered into between it and the plaintiffs, touching the matters mentioned.     The plaintiffs insist that while no written contract was entered into for the reason Pingle declined to approve it, there was a valid oral contract between the parties in the first instance which was neither merged in nor superseded by the writing.     There is no instruction contained in the record which pointedly refers this issue to the jury.     It is true, in some of the instructions for plaintiffs the contract "mentioned in the petition" is referred to the jury.     In none of them, however, is the issue referred in pointed terms for the jury to find whether the contract declared upon was or was not entered into between the parties, and in none of the instructions are the jury required to find its breach.     We may regard the matter concerning the breach as immaterial, however, inasmuch as the entire case shows the contract to have been breached, if it was in fact entered into.     Upon another trial, the issues should be defined with more particularity.

The defendant sought to have referred to the jury its theory of the case to the effect that the two conversations had with Superintendent Pingle by Tucker amounted to no more than preliminary negotiations, to be subsequently incorporated in writing by Randolph and the plaintiffs, subject to Pingle's approval.     To that end, it requested and the court refused to instruct in effect that if plaintiffs commenced the work for defendant under a written memorandum dated January 7, 1905, and not under an oral agreement and continued to work under the written memorandum until notified to quit on account of the disapproval of its terms by defendant's superintendent, then plaintiffs have failed to make out a case and the verdict should be for the defendant.     This instruction should have been given, for indeed, if plaintiffs refused to enter upon the work at all, as testified by plaintiff King, until they had a writ-

ing, then it is obvious that whatever oral agreement the parties may have had, was abandoned by the plaintiffs, and at their instance, merged in the writing which, by its terms, could only become a completed contract upon the approval of the superintendent, Pingle. Of course we do not mean to say that the rule operating a merger of all prior negotiations in the written contract applies in its full force here, for the reason no written contract was finally consummated because Pingle, who retained a veto power, refused to approve it. But what we do say is that the defendant was entitled to have its instruction for the reason it placed before the jury the question as to whether the plaintiffs relied upon an oral contract, as they claim, or whether what had been said between Pingle and Tucker were merely negotiations looking to a contract, to be thereafter reduced to writing by Randolph, subject to Pingle's approval.

In proving damages, plaintiffs' counsel asked plaintiff King the following question : "State whether or not you went to great expense in preparing and getting down and beginning this work." Over competent objection and exception, plaintiff answered : "I think the books will show between $600 and $700 expenses getting in there and beginning; supplies, tools, stuff, camp outfit, taken in there." The plaintiffs were professional railroad contractors. Their "tools, stuff, camp outfit, etc.," were of course valuable to them in the prosecution of the work for the defendant or any other railroad on which they might be employed and remained of value to them, notwithstanding the breach of the contract declared upon. Any element of damage predicated upon these items, "tools, stuff, camp outfit, etc.," was certainly remote and not allowable as a natural and necessary result of the breach of the contract complained of. [Applegate v. Franklin, 109 Mo. App. 293, 304, 84 S. W. 347.] The damages accruing to the plaintiff on

this score, if any, are the result of an unusual combination of circumstances which could not be reasonably anticipated and over which the defendant railroad company had no control. Such damages are remote. [8 Am. and Eng. Ency. Law (2 Ed.), 542.]

The verdict was for $2,000, in which nine of the jurors only concurred. The admission of the evidence complained of no doubt materially contributed to the result. The judgment should be reversed and the cause remanded. It is so ordered. *Bland, P. J.,* and *Goode, J.,* concur.