## APPLEGATE, Respondent, v. FRANKLIN, Appellant.

### St. Louis Court of Appeals, December 27, 1904.

1. **WATERS: Surface Water: Riparian Owners.** A body of water about 2,500 acres in extent, fed solely from rain and snowfall, varying in depth from three to six feet and largely filled with swamp vegetation, the land under which body of water had been surveyed and conveyed to individuals, possessed none of the characteristics of a public body of water, so as to give the littoral owners riparian rights, but was mere surface water.

2. ———: ———: **Drainage.** And a proprietor of a part of the land under such body of water could drain off the water without being liable to another proprietor for damages caused by draining the latter's land at the same time, provided such drainage was done in a reasonable and careful manner.

3. ———: ———: **Damages: Ferae Naturae.** In an action by one proprietor of land under the submerged surface, who had valuable fisheries thereon, for damages on account of drainage of the land by the other proprietor, evidence respecting the number of fish left dead in the bed of the lake after the drain-

age, was inadmissible. As *ferae naturae*, plaintiff had a qualified interest in the fish only which then were alive in the water above his land.

4. ———: ———: ———: **Remote Damages.** Likewise evidence of the plaintiff's fishing equipment was inadmissible.

5. ———: ———: ———. Evidence of the future market price of fish and the probable increased demand for them was inadmissible.

6. ———: ———: ———: **Damage to Feelings.** In such an action, there being no evidence tending to establish any malicious conduct, no punitive or exemplary damages were recoverable, and evidence of plaintiff as to mortification and lacerated feelings should have been excluded.

7. ———: ———: **Good Faith in Draining.** The defendant in such an action should have been permitted to prove that the construction of the drainage ditch was performed under an agreement with the county in which the land was located, for the purpose of showing good faith.

8. ———: ———: ———. Likewise the plaintiff should have been permitted to prove the benefits conferred on adjacent lands and the probable effect upon the health of the residents of the county, as a consequence of such drainage.

9. ———: ———: **Swamps: Judicial Notice.** Courts take judicial notice of the fact that overflows and floods are followed by disease and that swamps are detrimental to public health.

10. ———: ———: **Drainage: Trespass.** In an action by the owner of land covered by surface water, for damages to him caused by the drainage of the same by another proprietor of land under the same body of surface water, the plaintiff's recovery is limited to damages caused by the trespass of the defendant upon plaintiff's land in making the drainage.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED.

*Faris & Oliver* for appellant.

(1) The court erred in overruling the demurrer to the evidence, offered by defendant, at the close of plaintiff's testimony. It was incumbent on plaintiff to

show that the body of water drained was a natural
stream, or natural body of water as distinguished from
surface water. For if it were surface water, defendant
had the right to drain it, even though in so doing the
plaintiff should suffer injury. It was not only surface
water by all of the definitions, but a swamp and a
nuisance, as well. Benson v. Railroad, 78 Mo. 504;
Jones v. Railroad, 18 Mo. App. 251; Railroad v. Sch-
neider, 30 Mo. App. 620; Abbott v. Railroad, 83 Mo.
272. This lake was private property. It had been sold by
the State and county to private persons. It was not
meandered, but "sectionized," as other lands desig-
nated as "swamp lands." It could not in its natural
state be used for the carriage of boats or other proper-
ty. The mere fact that during floods from the Missis-
sippi river it was capable of being used for floating
boats, lumber or rafts, does not give it a public charac-
ter, nor make it navigable. Gould, Waters, sec. 109;
Munson v. Hungerford, 6 Barb. 265; Norgan v. King,
91 Am. Dec. 58; Olsen v. Merrill, 42 Wis. 203; Hub-
bard v. Bell, 54 Ill. 110; Brown v. Chadbourne, 50 Am.
Dec. 641. (2) The court in admitting irrelevant and in-
competent testimony offered by the plaintiff. (a)
Much evidence was offered over the objection of de-
fendant, as to the number of dead fish left upon the
former bottom of the lake after it was drained. Such
evidence could throw no light on any of the issues, and
could only have served to bias the jury. Fish being
*ferae naturae,* the dead ones did not belong to plaintiff.
The most he had was a limited property in them while
they were in the waters over his land. State v. Blunt,
85 Mo. 543; 13 Am. & Eng. Ency. of Law, (2 Ed.) 555.
(b) Testimony as to value of plaintiff's fishing tackle
and paraphernalia and his lack of use therefor, was
error, and injected into the inquiry a damage which had
no proximate connection with the mere act of digging
the ditch. The tackle was physically of the same text-
ure and commercial value after the digging of the

ditch, as it was prior thereto. Damages not proximate-
ly resulting from injury inflicted will be disregarded.
Ins. Co. v. Boone, 95 U. S. 130; Grattis v. Railroad,
153 Mo. 380, 55 S. W. 108; Fontaine v. Lumber Co.,
109 Mo. 55, 18 S. W. 1147; Saunders v. Brosins, 52 Mo.
50. (c) It was error to admit evidence of prospective
damages. Plaintiff's damages, if any, were such as had
accrued to him up to the date of instituting this action.
He had no right to inquire about, or to measure prob-
able value of fish or the increased demand for fish in
the market as of the time of the trial of this case, more
than two years after this suit was filed. Wayland v.
Railroad, 75 Mo. 552; Railroad v. Calkins, 90 Mo. 538;
3 S. W. 82; Blunt v. McCormick, 3 Denio 283. (3) It
was error to allow counsel for plaintiff, repeatedly to
say, over the objections of the defendant, that "Frank-
lin is a man of wealth." This was not a case for pun-
itive damages, as the court correctly declared in its
instructions, therefore, not a case where the wealth
of the defendant was important except as a means of
prejudicing the jury. Trimble v. Foster, 87 Mo. 49;
Beck v. Dowell, 11 Mo. 506; Clements v. Maloney, 55
Mo. 352; Buckley v. Knapp, 48 Mo. 152; 2 Greenleaf on
Evidence, sec. 269.

*W. W. Corbett* and *Roberts & Corbett* for respon-
dent.

(1) The court committed no error at the conclu-
sion of the introduction of testimony to refuse, over de-
fendant's objection to instruct the jury to find for the
defendant. The evidence warranted the verdict and
was for the right party, although an outrage, owing to
its small amount. That the State of Missouri and the
county of Pemiscot had the right to part with the title
to this land and lake is not controverted; the State and
county did part with it, and from this source plaintiff
and defendant derived their title. (Then this point,

so far as the plaintiff and defendant are concerned, is settled.) They were riparian owners. The plaintiff did not only own land down to low-water mark on Pemiscot lake; he owned two hundred and eighty acres and a larger portion of it constituted a portion of this lake. The defendant, as an adjoining riparian owner, had no legal right to interfere with the waters of this lake, should it in any way interfere with the rights of the plaintiff. Am. & Eng. Ency. Law, p. 651, 949. (2) The evidence showed that this was a natural, lasting body of water, that the vegetation in this lake would not grow except where there was water continuously, the same as Reelfoot lake. Webster v. Harris, 69 S. W. 782. (3) Pemiscot lake was not, in its legal sense, surface water. It was not a small pond, lagoon or bayou. It was not formed solely from heavy rains, melting snow, etc., and at other times was dry. When the lake was full, before it would overflow its shores; it would run out to the south or southwest into a defined passageway into Little river, a running stream leaving Pemiscot lake at a normal stage. It drains the surrounding county, the same as all other streams. The lake was private property, that is true. When these parties purchased the land they purchased the water with it, in its natural state. They both used it as a fishery, and if defendant wanted to drain plaintiff's land as well as his own by going onto plaintiff's land, he should at least have complied with the requisites of the statutes in such cases. R. S. 1899, ch. 99, art. 1, secs. 6951, 6952, 6953, 6954, etc., etc.

STATEMENT.

The exhaustive argument submitted on behalf of appellant felicitously concluded with the apt comment, that this was a case unique in legal annals, arising out of the conditions peculiar to the swamp lands of the

marshy counties of this State and resulting from a progressive purpose and well meant effort to adapt and fit such lands of that section for human habitation and agricultural uses.

The issues presented involve chiefly principles of law, rather than questions of facts, and the undisputed history of the case is, substantially and materially, thus submitted to the consideration of the court by the industry and research of opposing counsel. This action was inaugurated in the circuit court of Pemiscot county for the recovery by plaintiff against defendant of damages, both compensatory and punitive, attributed to the draining by defendant of a body of water entitled Pemiscot lake, adjacent to and in which plaintiff asserted title to two hundred and eighty acres of land, on which he had established and long maintained valuable fisheries. Pemiscot lake (also designated Big lake), was a shallow concourse of water located among the swamp lands in Pemiscot county in the southeastern corner of the State of Missouri, in dimensions about one and a half miles wide by about three miles in length, covering about twenty-five hundred acres of submerged land, irregular in shape, with two prominent projections, arms or pockets, known as the north and south openings; it is in effect a shallow depression in the surrounding county created in the seismic throes of nature which convulsed that section in the years of 1811 and 1812, familiarly known as the New Madrid earthquakes. The maximum depth, contrasted with the height of the banks or shores which are low, marshy and scantily defined, did not exceed six feet in normal stage, in which condition, it is devoid of current or flow, without channels except tortuous passages between jutting ridges and dotted with numerous small islands, dividing it into separate smaller bodies of water, from which at different periods of the year and under varying conditions, the water extended and spread out in all directions. Its minimum depth ever known was three

or three and one-half feet, but it fluctuated considerably in extent dependent on the precipitation of rain or snowfall. Prior to the construction of the system of levees, which now guard that section against floods of the Mississippi river, distant about two miles at nearest point, this lake had been supplied by water from that stream through a bayou or channel below the general level of the contiguous region and during high stages of water, the flow from the river filled the lake, which, continuing to rise with the increased volume of water in the Mississippi, would overflow and inundate the surrounding territory, particularly toward the west and south, with the excessive water received, even as far as to find escape occasionally into Big lake, Arkansas; as the height of the river would abate, the waters of the lake would recede, and the process become reversed. After the erection of the levee along the bank of the Mississippi river, the lake was fed solely with water from the rain and snowfall in the surrounding country through numerous bayous and sluggish lagoons. The waters of the lake were largely filled with paludal vegetation, consisting of moss, flags, swamp grass, pond lillies, yoncopins and like amphibious vegetable growth indigenous to marshes and swamps. In November, 1900, plaintiff was the owner and claimant of two hundred and eighty acres, neither situated in a compact body nor all contiguous, of which about one hundred acres were covered by the waters of the lake during its normal condition, when the lake was not ejecting its surplus water by encroachment on the adjoining territory in all directions. Plaintiff had entered a portion of his land from Pemiscot county and had bought part at $1.25 per acre about eighteen years prior to the time of the trial; he had constructed suitable improvements and expended considerable sums in establishing, developing and maintaining his fisheries and derived twenty-five hundred dollars or more per annum for many years from his business. He had at

one time sold to a partner an interest at rate of $1.25 per acre, but reacquired it at the price of five hundred dollars gross, procuring a reconveyance after institution of this action, after which he had also disposed of these lands, theretofore used by him for such fishing purposes, at eight dollars per acre. By the public and the plaintiff as well, fishing had been enjoyed in the water of the lake for many years. For the purpose of drainage of the lake from his own lands, of which he owned about twenty-five hundred acres lying either wholly in the lake or adjacent thereto, inclusive of the main bodies of water in the principal openings described, and to reclaim them for cultivation, defendant had proceeded, under authority of a contract made with Pemiscot county, to dig and construct a ditch, which was completed in 1901. This canal was extended from a similar drainage ditch already built by the county, up into and through the deepest portions of Pemiscot lake and resulted in drawing off of the waters from the lake and incidentally from the lands of plaintiff as well. A jury, under the instructions of the court, returned a verdict for plaintiff in sum of twenty-five hundred dollars, and defendant appealed.

REYBURN, J. (after stating the facts).—Ignoring and passing by, without discussion, various charges of infirmities in the record predicated on minor and subordinate features developed at the trial, not arising out of the principles controlling the case, nor likely to recur at any future hearing, and confining consideration to the questions peculiar to the case and decisive of it, the first and dominant proposition advanced by appellant is, that the imperative instruction asked on his behalf at close of the plaintiff's testimony should have been given. The land submerged by the lake water was private property, title to which had been parted with by the State and county to private individuals, including the parties hereto or their predecessors in title and

had been so transferred in the usual subdivisions distinctively as land by townships, sections and subdivided sections as other wet lands, distinguished as swamp lands. The testimony disclosed without contradiction that this volume of water was but a reservoir in the depression formed by the convulsions of nature described, in which water assembled, varying in magnitude and extent with the seasons, without possessing any of the attributes characterizing a public or navigable body of water. [Hoyt v. City of Hudson, 27 Wis. 656; Gould, Waters, par. 83, 109; Farnham, Waters, p. 127; Wagner v. Railroad, 2 Hun 633; Luther v. Winnismmet Co., 9 Cush. 171; Hubbard v. Bell, 54 Ill. 110; Olson v. Merrill, 42 Wis. 203.] In its natural and ordinary condition it was not inherently navigable nor even susceptible of use for commerce, nor suitable or valuable as flotage for rafts, flatboats, lumber or small light-draft vessels, the reduced test adopted by some authorities for the administration of the right of the public to the free and uninterrupted use and enjoyment of inland bodies for transportation, commerce and navigation. [Stuart v. Clark's Lessee, 2 Swan. 9; s. c., 58 Am. Dec. 49; Morgan v. King, 91 Am. Dec. 58; Brown v. Chadbourne, 50 Am. Dec. 641.] Nor was this lake a great pond or public body of water, to be held for the common and public use of all, the littoral owners upon which could have no right of property in the submerged soil beneath, below the natural low-water stage, as were the lakes involved in other decisions, in most of which States, however, such lakes had been the subject of legislative protection. [Potter v. Howe, 141 Mass. 357; Ternald v. Knox Woolen Co., 82 Minn. 57; Priewe v. Wisconsin, etc., Co., 33 L. R. A. 645, 93 Wis. 534.]

Plaintiff declared on no rights accruing to or possessed by him as a riparian owner, the trial petition set out for recovery, his ownership, the ancient existence of the lake, the establishment and maintenance of his valuable fisheries and the construction by defend-

ant for drainage of the lake for agricultural purposes, of a very large, commodious ditch without legal warrant, maliciously, wantonly and recklessly upon defendant's portion of the lake, and into the land and water of that portion of the lake owned by plaintiff, whereby plaintiff was deprived of his fisheries and his business ruined. The present contention, therefore, that defendant had no lawful right to impair or destroy the interest or the use of any other riparian owner to the water, might be justly disposed of, as a departure from the issues joined, and beyond the range of the plaintiff's declaration of his right of action. But, assuming plaintiff had based his right of recovery upon such littoral rights, the proof failed to sustain them. As stated, this mass of water was exhibited, as its diversified stages, as useless, unfit for commercial flotage and, therefore, not being subject to any servitude of such public use and common right of passage, it can not be perceived why it is not degraded to a condition not distinguishable, in legal contemplation and effect, from mere surface water and to be dealt with and treated as such. The doctrine of the civil law that the owner of the upper or dominant estate had a natural right of servitude in the lower or servient estate, to discharge all waters falling or accumulating upon his land as more elevated, upon or over the land of the servient owner, as in a state of nature, has been repudiated in Missouri, and the common law doctrine established, that no such natural easement or servitude exists in favor of the owner of the higher ground, and the proprietor of the lower ground may, if he chooses, lawfully obstruct or divert the natural flow of such water and in so doing may turn it back, on, off or over the lands of other proprietors without liability for such obstruction or diversion. [Abbott v. Railroad, 83 Mo. 272; Jones v. Hannoran, 55 Mo. 462; Benson v. Railroad, 78 Mo. 504; Railroad v. Schnider, 30 Mo. App. 620.] By analogy, the foregoing cases and like decisions in this State are author-

ity for and uphold the proposition that defendant was warranted in improving his lands for any desirable purpose, and it was immaterial that the effect of such improvement might change or lessen the volume of water previously discharged, diffused or situated upon the lands of adjoining proprietors to their injury by its diminution or modification provided the drainage was performed in reasonable and careful manner, the consequent loss thereby inflicted on plaintiff as depicted in his petition being *dammum absque injuria*. Defendant was but lawfully using and changing the face and surface of his own property, for which, properly and prudently performed, no action would lie at plaintiff's instance. The decision invoked from another jurisdiction in which plaintiff relied on to maintain a position, as shown outside the fair range of his pleadings and the issues, which defendant was summoned to rebut at the trial, upon an analysis presents but few features portrayed in the case under consideration and is marked by clear distinctions. The conclusions, summarized in the opinion alluded to, were that the body of water there involved, while not navigable in the technical legal sense, was navigable in the common acceptance of the term; that while the land underlying the waters of the lake was subject to grant by the State, complainants established title by lines terminating at low-water mark, but 'as riparian owners they were possessed of all rights incident to such ownership and that the defendant had failed to locate the lands he claimed under the lake by proof, and the decision arrived at upon such widely divergent state of facts, that complainants, as riparian owners, were entitled to have defendant restrained by injunction from any efforts to drain the waters of the lake, affirming the view of the chancellor. [Webster v. Harris, 69 S. W. 782.]

2. The trial court admitted much testimony that should have been excluded, which could not have failed

to operate upon the minds of the jury to the grave prejudice of defendant. The proof respecting the quantity and number of fish, left dead on the former bed of the lake after reliction, did not tend to establish any of the legal issues involved, and should not have been permitted to go before the jury. As *ferae naturae,* plaintiff's property rights in such fish were transitory, and qualified, attaching to such restricted degree, only while they were in the waters above his land. [State v. Blount, 85 Mo. 543.]

The testimony of the value of plaintiff's fishing equipment and paraphernalia in the absence of employment for them ensuing, infused into the inquiry of the estimate of plaintiff's damages and the range of his recovery, an element without proximate connection with the act of constructing the drainage canal. The plaintiff was entitled to recover such damages only as were the proximate and natural consequences of defendant's act, if unlawful, but not for results collateral and incidental; the fishing tackle of plaintiff was not affected in quality or market value after its use at the lake had been terminated. [Insurance Co. v. Boon, 95 U. S. 130; Fontaine v. Schulenbert, etc., Co., 109 Mo. 55, 18 S. W. 1147.] The proof tendered and received respecting prospective damages was improper; plaintiff's recoverable damages, if any, were defined and determined at time he instituted suit, and he was limited in recovery to those then accrued. Inquiry into the future market price of fish and probable increased demand for such commodity at time of the trial should not have been tolerated, especially as plaintiff had sold his lands immediately after beginning suit and, therefore, has parted with any interest in the fisheries for more than two years prior to time of trial. [Benson v. Railroad, supra.] There was no evidence introduced tending in the remotest degree to establish any oppressive or malicious conduct or intent on part of defendant, and, as the court properly determined, no punitive

or exemplary damages were recoverable and, therefore, statements of plaintiff individually and of other witnesses on his behalf, descriptive of his mortification, indignation and his lacerated feelings, as well as allusions to the wealth, actual or reputed, of defendant should have been rigorously excluded from the jury, as wrongful and very hurtful. [Buckley v. Knapp, 48 Mo. 152.] Defendant should have been permitted to prove that the construction of the drainage ditch was performed after and under an agreement with the county of Pemiscot; he was entitled to justify his conduct and demonstrate his good faith by such contract, the purpose of which was the reclamation and restoration for agriculture and habitation of the lands beneath the surface of the lake waters. The proof tendered on defendant's behalf of the extent of public benefits conferred on adjacent lands by the work and the probable effect upon the health and wellbeing of the residents of the county was also properly admissible. Courts take judicial cognizance of the fact that overflows and floods are followed by disease and that swamps are detrimental to public health. [Morrison v. Morey, 146 Mo. 543, 48 S. W. 629.]

It is apparent that the only lawful right of action disclosed in plaintiff was restricted to recovery for the lawful damages, consequent on the trespass manifested by the testimony in the encroachment of the dredge boat on plaintiff's land and the excavation of the soil of plaintiff.

The judgment is reversed and cause remanded. *Bland, P. J.,* concurs; *Goode, J.,* absent.