# UNITED STATES *v.* KANSAS CITY LIFE INSURANCE CO.

No. 1.  Argued October 20, 1948.—Reargued March 29, 1950.—Decided June 5, 1950.

*Frederick Bernays Wiener* argued the cause on the original argument and *Marvin J. Sonosky* on the reargu-

ment for the United States. With *Mr. Wiener* on the brief on the original argument and with *Mr. Sonosky* on the brief on the reargument were *Solicitor General Perlman* and *Assistant Attorney General Vanech*. *Roger P. Marquis* was also on the brief on the original argument, and *Ralph S. Boyd* was also on the brief on the reargument.

*Stanley Bassett* argued the cause for respondent. With him on the brief was *Ray B. Lucas*.

MR. JUSTICE BURTON delivered the opinion of the Court.

The respondent, Kansas City Life Insurance Company, obtained judgment in the Court of Claims against the United States for $22,519.60, with interest from August 8, 1938. 109 Ct. Cl. 555, 74 F. Supp. 653. This sum was awarded as just compensation for the destruction of the agricultural value of respondent's farm land by the United States in artificially maintaining the Mississippi River in that vicinity continuously at ordinary high-water level. The land was not in any sense within the bed of the river. It was one and one-half miles from the river on a nonnavigable tributary creek. Its surface was a few feet above the ordinary high-water level of both the river and the creek. The United States, however, contended that because it maintained the river at this level in the interest of navigation it need not pay for the resulting destruction of the value of the respondent's land. We granted certiorari because of the importance of the constitutional questions raised. 334 U. S. 810. The case was argued at the 1948 Term and reargued at this Term.

Two principal issues are presented. The first is whether the United States, in the exercise of its power to regulate commerce, may raise a navigable stream to its ordinary high-water mark and maintain it continuously at that level in the interest of navigation, without liability for

the effects of that change upon private property beyond the bed of the stream. If the United States may not do so, without such liability, we reach the other issue: Whether the resulting destruction of the agricultural value of the land affected, without actually overflowing it, is a taking of private property within the meaning of the Fifth Amendment to the Constitution of the United States. We decide both issues in favor of the respondent, the first in the negative, the second in the affirmative.

The material facts found by the court below include the following:

Respondent is the owner of 1,710 acres of farm land in Missouri, having an elevation of 422.7 to 428 feet above sea level. The land borders on Dardenne Creek, a nonnavigable tributary entering the navigable Mississippi River one and one-half miles below the farm. The agricultural value of the land has been largely destroyed by the construction and operation by the United States of Lock and Dam No. 26 on the Mississippi at Alton, Illinois, 25 miles below Dardenne Creek. The United States has operated this dam since August 8, 1938, as part of a system of river improvements to provide a navigable channel in the Mississippi between Minneapolis and the mouth of the Missouri.[1] The effect of the dam has been to raise the level of the Mississippi at the mouth of Dardenne Creek to a permanent stage of 420.4 feet above sea level. This was its previously ascertained ordinary high-water mark.

Before the effect of the dam was felt, the respondent's land drained adequately through its subsoil and a simple system of ditches and pipes emptying into the creek.[2] It

---

[1] 46 Stat. 918, 927; 49 Stat. 1028, 1034. As to the same system of improvement, see *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592.

[2] Before August 8, 1938, during about 75% of each year, the river did not exceed a stage of 419.6 feet at Dardenne Creek. From 1930

was highly productive. When, however, the dam raised the river and the creek to 420.4 feet and maintained the water continuously at that level, this destroyed the agricultural value of the respondent's land at surface elevations between 423.5 and 425 feet.[3] The damage was caused by the underflowing of the land.[4] This undersurface invasion was substantially as destructive as if the

---

to 1937, between June 21 and September 21, it averaged 413.9 feet. For several months at the beginning and end of a year, its stage was 410 feet or less. The bed of the creek at respondent's farm was 410 to 413 feet above sea level. The water in the creek created a stage of 412 to 416 feet.

[3] Although, as stated in the text, the Mississippi River, at 420.4 feet, destroyed the agricultural value of certain parts of the respondent's land, it did not perceptibly change the value of the respondent's wet land below 423.5 feet or of its dry land above 425 feet. No compensation was allowed for the 602.04 acres so located.

[4] The court below made extended findings as to the expectation of the Army Engineers that damages, comparable to those which did occur, would result to respondent's land. The Engineers recommended that the United States purchase the land. House Committee on Rivers and Harbors, Doc. No. 34, 73d Cong., 2d Sess. (1934), and House Committee on Rivers and Harbors, Doc. No. 34, 75th Cong., 1st Sess. 14, 55–56 (1937). The project was authorized by Congress and power to condemn the land was given to the Secretary of War August 26, 1937, 50 Stat. 844, 848. However, the court below concluded correctly that—

"The Government did not, in fact, purchase or acquire by eminent domain a portion of the plaintiff's land, as the Army Engineers had recommended, or ditch and tile another portion, as they had recommended. It just went ahead and built its lock and dam. The plaintiff still owns its land. We think that the legislation quoted above, while it might have constituted an authorization to acquire some of the plaintiff's land by eminent domain, and to spend money in tiling and ditching another part of it, does not constitute a Congressional waiver of immunity from suit or confession of liability for the consequences of building the dam." 109 Ct. Cl. at p. 574, 74 F. Supp. at p. 654.

See *Mitchell* v. *United States*, 267 U. S. 341, 345; *United States* v. *Alexander*, 148 U. S. 186, 188–190.

land had been submerged. The water table was raised both by the percolation of the water which rose and fell with the river and by the resulting blockade of the drainage of the land's surface and subsurface water.[5] The

[5] The Court of Claims found that—

"16. Underneath the clay soil on plaintiff's land, there is a stratum of water-bearing sand, the top elevation of which varies from 412 to 414 feet above mean sea level. The water in the sand is affected by the rise and fall of the Mississippi River and the water table under the land rises and falls in response to high or low water conditions in the river. The water level in the underground strata is also affected by rainfall on the land, because the sand stratum acts as a reservoir for water which drains vertically from the surface of the ground.

.       .       .       .       .

"18. The average pool elevation which has been maintained at the mouth of Dardenne Creek by operation of Dam 26 is 420.4 feet, and the elevation of the water in Dardenne Creek adjacent to plaintiff's farm has been raised from six to seven feet above the previous normal level. As a result of the operation of the dam, the surface of the water in the creek has been raised so that the creek water now backs into some of the outlet pipes in the plaintiff's levee, thereby obstructing and delaying the drainage of surface water from plaintiff's land. In addition, by maintaining the surface of the water in the creek to an elevation of 420 feet or more above sea level, the drainage of the underground water from a large portion of the plaintiff's farm has been almost entirely shut off. Prior to the construction of the dam this underground water drained through the sand strata under the land into the creek, which was normally only 2 or 3 feet deep at that time.

"19. . . . Since the dam has been in operation, the conditions and the period of time, formerly available for draining the land and drying the soil, no longer exist.

"20. As a result of the river stage being controlled by the operation of the dam, the water table under plaintiff's land is from four to five feet higher than it was during the low stages of the Mississippi prior to the erection of the dam. Under controlled river conditions, the water table beneath plaintiff's land has been raised to an elevation varying from 420.5 feet to 422 feet, or an average of from one to two feet higher than the controlled river stage at Dixon's Landing. [The elevation of the river at Dixon's Landing was about the same as at

reduction of $22,519.60 in the market value of the land is not disputed.

It is well settled that, under the Commerce Clause, U. S. Const. Art. I, § 8, Cl. 3, the United States has the power to improve its navigable waters in the interest of navigation without liability for damages resulting to private property within the bed of the navigable stream.

---

the mouth of Dardenne Creek.] The drainage of the underground water from beneath a large area of plaintiff's land has almost ceased. On some portions of the land, vertical drainage from the surface to the underlying sand stratum has been cut off and on other portions it has been greatly retarded as a result of the increased height of the water table.

"21. The effects of the operation of the dam became apparent within a short time after the full pool stage was obtained on August 8, 1938. After a rain, the surface of the soil dried out much more slowly than before and the drainage ditches did not carry off the water as readily. Excessive moisture was retained in the soil and the planting of crops was delayed. Even when the surface appeared to be dry, the ground underneath was wet and would not support tractors and other farm machinery, which became mired down and had to cease operations. Seed planted on some portions of the land failed to germinate and would rot. It was not possible to follow a proper crop rotation program. Because the soil was often too wet for planting some crops, it was necessary to substitute other crops which mature in a shorter time." 109 Ct. Cl. at pp. 565–569.

In its opinion, the Court of Claims concluded that—

"The construction of Lock and Dam No. 26 raised the level of the water in the river and the creek, when the pool behind the dam was filled in 1938, to 420.4 feet above mean sea level, which was approximately the altitude of ordinary high water level before the construction of the lock and dam. We have found that the consequence of this raising of the water level in the creek has been to shut off the flow of some of the tubes leading through the levee and thereby prevent the surface water from draining off some of the land. A more serious consequence, however, has been that it has prevented water in the strata underneath the plaintiff's land from draining away, thus keeping the underground water within one, two, or three feet from the surface of different portions of the plaintiff's land, thereby impairing its value for farming." *Id.* at p. 573, 74 F. Supp. at p. 653.

"The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high-water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. [Citing cases.] The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592, 596–597.[6]

The ordinary high-water mark has been accepted as the limit of the bed of the stream. In *United States* v. *Willow River Power Co.*, 324 U. S. 499, 509, where compensation was denied, this Court said: "High-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid. But the award here does not purport to compensate a flooding of fast lands or impairment of their value. Lands below that level are subject always to a dominant servitude in the interests of navigation and its exercise calls for no compensation."

These cases point the way to our decision in the instant case. In the *Chicago* case, *supra,* the United States insti-

---

[6] *Willink* v. *United States,* 240 U. S. 572; *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251; *Lewis Blue Point Oyster Cultivation Co.* v. *Briggs,* 229 U. S. 82. Loss of access to a navigable stream is not compensable. *Scranton* v. *Wheeler,* 179 U. S. 141; *Gibson* v. *United States,* 166 U. S. 269. See also, *United States* v. *Commodore Park,* 324 U. S. 386. A change in the flow of a navigable stream does not deprive the private user of that stream, for power purposes, of a compensable right. *United States* v. *Willow River Power Co.,* 324 U. S. 499; *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53.

tuted condemnation proceedings to acquire the right to back the waters of the Mississippi over a right of way and against an embankment owned by the respondent railroad and telegraph companies. The precise issue was the Government's liability for damage done to that embankment by raising the waters of the river to and above their ordinary high-water mark. The respondents contended that the damage even to that part of the embankment which stood on land within the bed of the river was compensable and the Court of Appeals so held. 113 F. 2d 919. This Court reversed that judgment for the reason that all land within the bed of a navigable stream is subject to a servitude in favor of the United States, relieving it from liability for damages to such land resulting from governmental action in the interest of navigation. In addition, this Court remanded the case for determination of the disputed claim of the respondents that three other segments of their embankment were on land which was above the ordinary high-water mark of the river and that two of those segments abutted not on the Mississippi River but on a nonnavigable tributary. 312 U. S. at p. 599. The order to determine that question indicates that the basis of the decision was that the navigation servitude does not extend to land beyond the bed of the navigable river.

The opinion in the *Chicago* case also sheds light upon the earlier cases. It limits the decisions in *United States v. Lynah*, 188 U. S. 445, and *United States v. Cress*, 243 U. S. 316, so that they do not conflict with the Government's dominant servitude when it is applied to the bed of a navigable stream. In the *Kelly* case, which is reported with the *Cress* case, the land in question was on a nonnavigable tributary of the navigable Kentucky River. The Government's dam raised the waters of the river which, in turn, raised those of the tributary across which Kelly had built a mill dam. This Court upheld the judgment

requiring the United States to pay Kelly for the loss of his power head at his mill which resulted from this change in the level of the tributary. Similarly, in the *Cress* case itself, this Court assumed that a tributary of the Cumberland River was not navigable. It then allowed recovery for the destruction of the value of the land and of a ford across the tributary. All of this destruction was caused by the Government's dam on the river but was done at points beyond the bed of that river. In the *Chicago* case, this Court's view of the *Cress* decision was expressed as follows:

> "What was said in the *Cress* case must be confined to the facts there disclosed. In that case, the Government's improvement in a navigable stream resulted in the flooding of the plaintiff's land in and adjacent to a non-navigable stream. The owners of the land along and under the bed of the [nonnavigable] stream were held entitled to compensation for the damage to their lands. The question here presented was not discussed in the opinion." 312 U. S. at p. 597.

The extent of the Government's paramount power over the bed of navigable streams was further clarified in *United States* v. *Willow River Power Co., supra.* The respondent there claimed compensation for the reduction of a power head, which reduction was caused by a Government dam which raised the level of the navigable river into which the respondent dropped the water from its dam built on a nonnavigable tributary. Compensation was denied on the ground that because the loss of power to the respondent occurred within the bed of the navigable river, such loss was covered by the Government's dominant power to change the river's level in the interest of navigation. This Court said:

> "We are of opinion that the *Cress* case does not govern this one and that there is no warrant for

applying it, as the claimant asks, or for overruling it, as the Government intimates would be desirable. . . . In the former case the navigation interest was held not to be a dominant one at the property damaged; here dominance of the navigation interest at the St. Croix [the navigable river] is clear." 324 U. S. at p. 506.

It is not the broad constitutional power to regulate commerce, but rather the servitude derived from that power and narrower in scope, that frees the Government from liability in these cases. When the Government exercises this servitude, it is exercising its paramount power in the interest of navigation, rather than taking the private property of anyone. The owner's use of property riparian to a navigable stream long has been limited by the right of the public to use the stream in the interest of navigation. See Gould on Waters, c. IV, §§ 86–90 (1883); I Farnham, Waters and Water Rights, c. III, § 29 (1904). This has applied to the stream and to the land submerged by the stream. There thus has been ample notice over the years that such property is subject to a dominant public interest. This right of the public has crystallized in terms of a servitude over the bed of the stream. The relevance of the high-water level of the navigable stream is that it marks its bed. Accordingly, it is consistent with the history and reason of the rule to deny compensation where the claimant's private title is burdened with this servitude but to award compensation where his title is not so burdened.[7]

---

[7] This is clearly illustrated in *United States* v. *Chicago, M., St. P. & P. R. Co., supra.* The United States raised the level of the navigable river above its ordinary high-water mark. This Court then declined to allow compensation for the damage caused to the segment of the respondent's embankment which concededly was located on land within the bed of the river. On the other hand, the lower court

The next question is whether or not the Government's destruction of the agricultural value of the respondent's land in this case amounted to a taking of private property for public use within the meaning of the Fifth Amendment.

This case comes within the principle that the destruction of privately owned land by flooding is "a taking" to the extent of the destruction caused. The decisions in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; *United States* v. *Lynah, supra; United States* v. *Williams*, 188 U. S. 445, and same case, 104 F. 50, 53; *United States* v. *Welch*, 217 U. S. 333; and *United States* v. *Cress, supra*, illustrate the development of that principle.[8]   Although they have been

awarded compensation for the damage done to such segments of the embankment as concededly were on land above the bed of the river. No appeal was taken from that award.   Finally, as to three other segments with regard to which there was a disagreement as to whether or not they were on land within the bed of the river, this Court remanded the case to the District Court to resolve that factual issue.

[8] In interpreting a like provision in the Constitution of Wisconsin, this Court held that continuous flooding amounted to a taking of the land flooded.   It said:

". . . it remains true that where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle." *Pumpelly* v. *Green Bay Co., supra*, at p. 181.

The above case was quoted with approval in *Scranton* v. *Wheeler*, 179 U. S. 141, 154, and in *United States* v. *Lynah, supra*, at p. 469. The last named case involved seepage, percolation and some flooding which turned the land into a bog.

In the *Cress* case, after discussing and approving the reasoning in the *Green Bay* and *Lynah* cases, the Court said:

"There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent

limited by later decisions in some respects, the above cases have been accepted and followed in this respect. *United States* v. *Chicago, M., St. P. & P. R. Co., supra,* at pp. 597–598;[9] *United States* v. *Commodore Park,* 324 U. S. 386; *United States* v. *Willow River Power Co., supra;* and see *United States* v. *Causby,* 328 U. S. 256.

The findings in the instant case show that the land was permanently invaded by the percolation of the waters from both the river and its tributary. The percolation raised the water table and soaked the land sufficiently to destroy its agricultural value. The continuous presence of this raised water table also blocked the drainage of the surface and subsurface water in a manner which helped to destroy the productivity of the land.[10] Whether the prevention of the use of the land for agricultural purposes was due to its invasion by water from above or from below, it was equally effective. The destruction of land value, without some actual invasion of the land and solely by preventing the escape of its own surface water, is not before us. Even such a situation would come within the *Cress* case if it were established under Missouri law that the owner of land on a nonnavigable stream

---

liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain." 243 U. S. at pp. 328–329.

[9] In the *Chicago* case this Court overruled the *Lynah* case, *supra,* insofar as it upheld compensation "for injury or destruction of a riparian owner's property located in the bed of a navigable stream." 312 U. S. at p. 598. The Court, however, expressly mentioned that case as an authority on the point that the flooding of land, as there done, amounted to a compensable taking of it.

[10] See note 5, *supra.*

has a right to the unobstructed drainage of that land.[11]

One point remains. The Government contends that the findings of the court below do not properly describe the interest taken. That court found:

> "29. The privilege exercised by the Government, for which the plaintiff is given compensation in this suit, is the privilege of permanently maintaining Lock and Dam No. 26 at their present height, and operating them in such a manner as to fulfill the purposes of their construction and other purposes which may develop in the future and do not greatly vary from present purposes." 109 Ct. Cl. at p. 572.

The above statement, read in its context, permits the United States to maintain the level of the river and its tributary at 420.4 feet above sea level with the effect on the respondent's land that has been described. This

---

[11] Based upon the law of Kentucky, upholding the right of a land-owner on a nonnavigable creek to have the benefit of the unobstructed flow of that creek, this Court allowed the landowner compensation in the *Kelly* case, which is reported with the *Cress* case. The Court there said: "The right to have the water flow away from the mill dam unobstructed, except as in the course of nature, is not a mere easement or appurtenance, but exists by the law of nature as an inseparable part of the land." 243 U. S. at p. 330.

Although the court below reached no express conclusion on the right of respondent to drain its land into Dardenne Creek, there is no indication that such drainage was not a lawful incident of the property ownership. Under Missouri law, the owner of land bordering on a nonnavigable stream has title to the bed of the stream to its center, unless the instruments of title show a contrary intent. *Brown* v. *Wilson*, 348 Mo. 658, 665, 155 S. W. 2d 176, 179. Also, a downstream riparian owner has no right to dam the stream so as to cause it to accumulate water and flow it back on the land of upstream riparian owners. *Keener* v. *Sharp*, 341 Mo. 1192, 111 S. W. 2d 118, and see *Greisinger* v. *Klinhardt*, 321 Mo. 186, 193, 9 S. W. 2d 978, 980–981.

meets the requirements for a valid description of the interest taken as indicated in *United States* v. *Causby,* 328 U. S. 256, 267.

The judgment of the Court of Claims accordingly is

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE REED, and MR. JUSTICE MINTON concur, dissenting.

What respondent here purports to claim is a property right in the unfettered flow of Dardenne Creek in its natural state. But what respondent in substance claims is a property right in the unfettered flow of the Mississippi in its natural state. The two are necessarily the same, for water seeks its own level. No such right accrues to one who owns the shore and bed of the great river, until that river is raised above high-water mark. And we think that one who is riparian to a tributary has no greater claim upon the flow of the Mississippi. For this Court has held it to be "inconceivable" that "the running water in a great navigable stream is capable of private ownership." *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 69. It would be incongruous to deny compensation to owners adjacent to navigable rivers and require it for others bordering their tributaries for like injuries caused by the single act of lifting the river's mean level to the high-water mark. Because water seeks its own level, raising the level of the river necessarily raises that of the tributary at their conjunction and as far upstream on each as the effects of the lifting may go. These facts are equally apparent to both types of owners. We think they should be anticipated by both, and that the one has no more power to obstruct or burden the power of Congress in its control of the river's bed in the interest of navigation than the other. Neither has any greater right to have the river flow in its natural state than the other.

Basically the problem in this case is to locate a workable and reasonable boundary between Congress' power to control navigation in the public interest and the rights of landowners adjacent to navigable streams and their tributaries to compensation for injuries flowing from the exercise of that power. The Constitution does not require compensation for all injuries inflicted by the exercise of Congress' power. Neither is the power unlimited. The line therefore must be drawn in accommodation of the two interests. This could be done, as it was in *United States* v. *Cress,* 243 U. S. 316, by allowing compensation for all injuries inflicted by any change in the natural level and flow of the stream; it can be done, as in *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592 and *United States* v. *Willow River Co.,* 324 U. S. 499, by allowing change in the natural flow to the extent of lifting the mean level to high-water mark without liability for constitutional compensation; it could be done by applying the latter rule to owners riparian to the navigable stream, the former to those riparian to nonnavigable tributaries.

There is no sound reason for treating the two types of owners differently. Congress has power to regulate commerce by raising the level of a navigable stream to high-water mark without liability for compensation to any riparian owner. The effect upon the riparian owner of the river's tributaries, whether navigable or nonnavigable, is the same as that upon the owner riparian to the river itself. So is the congressional power and the dominant servitude. In this view no vested private right is given to anyone, as against the public interest, in the full utilization and control of the river's bed for navigation or in the flow of the stream within it. If Congress acts beyond this limit, then the Amendment will come into play to protect the landowner's interest.

This view requires the overruling of the *Cress* case. But until today's ruling the *Cress* case had been largely

destroyed by intervening decisions. See *United States v. Chicago, M., St. P. & P. R. Co., supra; United States v. Willow River Co., supra.* I would complete the process and allow the United States the full use of its dominant servitude in a navigable stream.

I am indebted to the late Mr. Justice Rutledge for much of the phraseology and content of this dissent.

MR. JUSTICE MINTON, dissenting.

I agree with all that MR. JUSTICE DOUGLAS says in his dissent, but I would for an additional reason reverse this case. The waters interfered with here were surface and percolating or subsurface waters. Respondent had always enjoyed the economic advantage of having its surface and subsurface water drain into Dardenne Creek. The raising of the water level in the Mississippi has interfered with this advantage. But surface and subsurface waters are outlaws in Missouri, as at common law, and anyone may defend against them and interfere with their natural drainage.[1] No right exists under Missouri law to have surface or subsurface water flow naturally onto adjoining land. Landowners may build embankments, dykes, or other obstructions to stop the flow of surface water upon their land. Although it appears that under Missouri law a riparian owner may not dam a watercourse so that it is obstructed or the lands of another are flooded,[2] no authority has been brought to my attention

[1] See, *e. g., Goll* v. *Railroad,* 271 Mo. 655, 197 S. W. 244; *Johnson* v. *Leazenby,* 202 Mo. App. 232, 216 S. W. 49; *Mehonray* v. *Foster,* 132 Mo. App. 229, 111 S. W. 882; *Applegate* v. *Franklin,* 109 Mo. App. 293, 84 S. W. 347; *Gottenstroeter* v. *Kappelmann* [reported as *Gottenetroeter* v. *Kapplemann* and *Gottenetroeter* v. *Kappleman*], 83 Mo. App. 290; *Collier* v. *Chicago & A. R. Co.,* 48 Mo. App. 398.

[2] See *Keener* v. *Sharp,* 341 Mo. 1192, 111 S. W. 2d 118; *Greisinger* v. *Klinhardt,* 321 Mo. 186, 9 S. W. 2d 978; *Waterworks Co.* v. *Jenkins,* 62 Mo. App. 74.

which would indicate that the obstruction of drainage by raising the water level of a stream confers a cause of action. I had not supposed that just compensation requires the Government to pay for that which a riparian owner may freely do under state law. The Government, by interfering with the drainage into Dardenne Creek, is not "taking" any "right" of respondent.

> ". . . not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." *United States* v. *Willow River Co.,* 324 U. S. 499, 502.

Since the United States may with impunity cause land lying within the bed of the stream to be overflowed as a superior right to control navigation, and since respondent has no right to the unhampered drainage of surface and subsurface water, it follows that the Government has taken no right of respondent. Therefore it is not bound to pay compensation. It would be anomalous indeed that while the Government may flood lands lying between high- and low-water marks without paying compensation, it is liable for an interference with drainage of surface water by raising the water level to high-water mark. I would reverse the judgment.