**NORTH et ux. v. UNITED STATES.**

**No. 1769.**

United States District Court
D. Utah, Central Division.

Dec. 27, 1950.

Edwin D. Hatch, Salt Lake City, Utah, for plaintiff.

O. K. Clay, Asst. U. S. Atty., Salt Lake City, Utah, for defendant.

**RITTER, District Judge.**

The United States through the Department of Interior Reclamation Service has constructed a dam in Provo Canyon, Utah. The waters of the Provo River, as a result, are backed up in the Deer Creek Reservoir. At the head of the dam in the village of Charleston, Wasatch County, the high water level of the reservoir is about 500 feet from plaintiff's lands and home. It is admitted that no water from the river or the reservoir is backed up upon plaintiff's lands and none reaches his land through underground percolation or otherwise.

The claim of the plaintiff is that at high water level in the reservoir, the level of underground waters on his premises is raised because of an interference with the free and natural underground flow of the ground waters. He claims some flooding of his cellar and cesspool. The maximum elevation of the reservoir waters is 5717 feet above sea level. The bottom of the North's cellar is 5725 feet above sea level. The engineering testimony is clear to the effect that no reservoir water soaks back into North's land.

The land in this vicinity is old river bottom land. It is cobblestone, gravel and sand through which water freely makes its way. A good deal of irrigating is done in the fields in the vicinity and large amounts of water are carried in sizeable ditches, near plaintiff's property. At times surface flooding from extensive irrigation covers the roads past plaintiff's land. On the record it is at least as permissible to conclude that the rise of the water in North's cellar is attributable to such irrigation as to any effect of the reservoir upon the underground water level. However, assuming that such is not the case, can plaintiff recover?

Recovery is sought upon two theories: (1) That the government has taken plaintiff's property without just compensation and the Fifth Amendment to the Constitution of the United States entitles him to compensation. (2) That recovery can be had under the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq.

On the question of "taking" of property within the meaning of the Fifth Amendment, although there are some borderline cases that appear to conflict, yet in the main the courts adhere to the principle that in order to constitute a "taking" there must be: (A) a direct invasion of plaintiff's property by the waters of the government; and (B) that the invasion of such waters must be permanent so that the lands of the plaintiff are practically destroyed or that the invasion is a recurrent one amounting to an easement. Otherwise, the damage, if any, is consequential and amounts to tort only.

The case of U. S. v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, appears to be such a borderline case. However, even in that case the court adheres to the well defined principles set out in (A) and (B) above. In the said case, 339 U.S. at page 810, 70 S.Ct. at page 891, the court says: "The findings in the instant case show that the land was *permanently* invaded by the percolation of the waters from both the *river* and its tributary. The percolation raised the water table and soaked the land sufficiently to destroy its agricultural value." (Italics ours.) It will there be noticed that it was the government's water from the river which invaded plaintiff's land, and the government's water, mingled with other waters, destroyed permanently the agricultural value. There is no such issue in the North case. The reservoir water didn't come within 500 feet of the North's land. The maximum elevation of the reservoir water was 5717 feet. The bottom of North's cellar was 5725 feet, and the reservoir water never reached such elevation. Furthermore, the court on the same page says: "The destruction of land value, *without some actual invasion* of the land and solely by preventing the escape of its own surface water, is not before us."

So it will be seen that that question was not decided. In the present case the government is not preventing the escape of plaintiff's surface water. The offense, if any, is of still less degree. The government may be preventing the escape of un-

derground water. This underground water is not the plaintiff's "own surface water".

The John Horstmann Co. v. United States case, 257 U.S. 138, 42 S.Ct. 58, 59, 66 L.Ed. 171, cited to the court orally, was the case wherein the government constructed the Truckee-Carson project whereby the waters of the Truckee River were transported to the Carson River. In doing so, dams were built causing the ground waters to rise, and the surface waters in the two Soda lakes to rise to a maximum of 19 vertical feet, thereby destroying the value of the Soda lakes. The damage to one of the lakes was $35,000.00 and to the other lake $170,000.00. In holding that the damage to the property of the plaintiffs was consequential and thereby constituted a tort and did not amount to a "taking", the court said: "It is to be remembered that to bind the government there must be implication of a contract to pay, but the circumstances may rebut that implication. In other words, what is done may be in the exercise of a right and the consequences only incidental, incurring no liability".

The court then cites Bedford v. U. S., 192 U.S. 217, 24 S.Ct. 238, 240, 48 L.Ed. 414. In the Bedford case the government straightened out a bend in the Mississippi River for the purpose of avoiding erosion of land on one bank and thus avoid injury to the land. As a result of the straightening of the river, the velocity of the flow was very much increased, causing submersion of a part of plaintiff's land lying six miles below. The court said, with reference to the damage done to plaintiff's land: "In the case at bar the damage was strictly consequential. * * * the works were constructed along the banks of the river, and their effect was to resist erosion of the banks by the waters of the river. * * * therefore, the damage to appellants' land, if it can be assigned to the works at all, was but an incidental consequence".

Although the court in the Kansas City case adheres to the decisions in the U. S. v. Lynah case, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, and the U. S. v. Cress case, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, it was pointed out that the decisions in those two cases must be strictly limited to the particular facts in each case, and further pointed out that the effect of the two decisions "have been limited by later decisions in some respects," citing U. S. v. Chicago, M. St. P. etc., 312 U.S. 592, 313 U. S. 543, 61 S.Ct. 772, 85 L.Ed. 1064, and U. S. v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 764, 89 L.Ed. 1101. In the Willow River case the government built a dam on the Mississippi River. The high water in the dam impaired the efficiency of the hydro-electric plant of the plaintiff, causing damage in the amount of $25,000.00. The court held such damage to be consequential and that it did not constitute a "taking". The court said: "The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project. It does not undertake, however, to socialize all losses, but those only which result from a *taking* of property. If damages from any other cause are to be absorbed by the public, they must be assumed by act of Congress and may not be awarded by the courts merely by *implication* from the constitutional provision."

In the Chicago case, plaintiff's railroad was built on an embankment. By building a dam the government caused the Mississippi River to rise, destroying the tracks of the railroad. Even in such case, where it was government's water that did the damage, the court held that such damage was a consequential one and did not constitute a "taking" of private property. The Chicago case overrules in part the Lynah case which is cited by the court in the Kansas City case. However, in the Lynah case the government built a dam in the Savannah River, causing the water to back up, flow over the banks, and to *completely submerge* a large plantation owned by plaintiff, thereby rendering it completely unfit for use. Accordingly, the court held that such result constituted a complete taking of the land. At page 470 of 188 U.S. at page 357 of 23 S.Ct. the court said: "It is clear from these authorities that where the

government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment."

■ Of course, there is no contention in the North case that the government has destroyed their land, nor is it contended that it has permanently deprived them of the use of their cellar. Even if it were so contended, the measure of damages would be the value of the cellar or the cost of constructing another cellar.

■ In the U. S. v. Cress case, 243 U.S. 316, 37 S.Ct. 380, 384, cited in the Kansas City case, the government, by the erection of a lock and dam in the Cumberland River, caused the waters in said river to overflow on plaintiff's land. The court held that such result constituted a "taking": "We deem it clear that so much of the properties of the respective defendants in error as was unaffected by the flow of the rivers or their tributaries prior to the construction of the locks and dams in question was private property, and not subject to be overflowed, without compensation, in the raising of the level of the rivers by means of artificial dams." Such quotation shows that it was government water that overflowed the owners' lands. However, in the Cress case there was also a claim for damages based upon the fact that by reason of the erection of the lock and dam a mill could no longer be driven by water power. This appears to be a consequential damage but nevertheless was construed by the Supreme Court as being a "taking." However, it is in direct conflict with the U. S. v. Willow River case, 324 U.S. 499, 65 S.Ct. 761. The court in the Willow River case attempts to distinguish it from the Cress case but I am unable to see any difference. It appears to me that the Willow River case is in direct conflict with the Cress case. In the Cress case, loss of water power was held to be a "taking." In the Willow River case it was held not to be a "taking."

In Sanguinetti v. U. S., 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608, congress authorized the construction of a canal by means of which the waters of Mormon Slough were diverted into the Calaveras River. The canal was constructed in accordance with plans prepared by the government engineers. A diversion dam was placed in the slough immediately below the intake of the canal. The excavated material was put on the lower side of the canal, making a levee. When the canal filled as a result of the levee, the waters from the canal were cast on the upper side of the canal, flooding plaintiff's land. It would appear that in view of the fact that it was the government's water which flooded plaintiff's land that that clearly constituted a "taking." However, the Supreme Court held it did not. The court appeared to base its decision upon the following:

"None of the land of appellant was *permanently* flooded, nor was it overflowed for such a *length of time* in any year as to prevent its use for agricultural purposes. It was not shown, either directly or inferentially, that the government or any of its officers, in the preparation of the plans or in the construction of the canal, had any *intention* to thereby flood any of the land here involved, or had any reason to expect that such result would follow. * * *

"The Court of Claims concluded that none of the land here involved had been taken, within the meaning of the Fifth Amendment to the Constitution, and that therefore no recovery could be had upon the theory of an implied contract, but that the liability sought to be enforced was one sounding in tort, of which the court had no jurisdiction. Accordingly the petition was dismissed."

And the court affirmed the decision of the court of claims.

In Lynn v. U. S., 5 Cir., 110 F.2d 586, the plaintiff complained that the government by raising the waters of the Tennessee River prevented the natural drainage of the waters from her land into the river. She alleged, in substance, that by raising the water of the river it obstructed the outlets of the drains and caused the waters on her land, both the surface and the underground waters, to back up, resulting in her land becoming boggy, swampy, and incapable of cultivation. The court held that this constituted a consequential damage and did not

amount to a "taking." At page 589 of 110 F.2d the court said: "The drains under the conveyed lands are in themselves of no value apart from their service to the drained lands. * * * We understand that the United States in exercising their constitutional power over navigable streams may raise their level and thereby obstruct the drainage of surface waters on nearby lands, and although damage be thereby done for which a private person acting for himself would be liable as for a tort, the land is *not taken* under the Constitution unless the *waters of the stream* be backed upon the land."

In the case cited by plaintiff, U. S. v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, the water of the Kanawha River, *permanently* flooded plaintiff's land, and in that case the court held that such result constituted a "taking". In that case, also, judgment was allowed to the plaintiff for the intermittent flooding of other parts of his land, the court holding that the *continuous* and *annual* intermittent flooding constituted an easement; but no such issue is involved in our case.

In the Kansas City case, which appears to be relied on by plaintiffs, the court discusses only the question of drainage. There is no such question in the present case. Furthermore, the decision was a divided one of five-four, and we think that the logic of the dissenting judges is more persuasive than the reasoning of the main decision.

As to plaintiffs' contention that recovery can be had here under the Federal Tort Claims Act, the matter is too plain for extended discussion. In the judgment of this court the matter is concluded by a well reasoned opinion of the Court of Appeals for the Eighth Circuit, in Coates et al. v. United States, 181 F.2d 816, 817. In the case at bar we have a large irrigation project which involves "decisions and the exercise of discretion and discretionary functions of the highest order by both the legislative and executive branches of the government, and the formulation, expression and application of governmental policy". As the Court of Appeals says,

it would be difficult to give a clearer example of the exercise and performance of discretionary functions and duties by federal agencies within the exception of the Federal Tort Claims Act.

Judgment, therefore, is for the defendant.