**Billy C. HARRIS and Juanita Harris,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 72–1067.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 15, 1972.

Decided Oct. 18, 1972.

Pearce, Robinson & McCord, Fort Smith, Ark., for appellants.

Kent Frizzell, Asst. Atty. Gen., Jacques B. Gelin and Dirk D. Snel, Attys., Dept. of Justice, Washington, D.

C., Bethel B. Larey, U. S. Atty. and Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for appellee.

Before VOGEL, VAN OOSTERHOUT, and ROSS, Circuit Judges.

PER CURIAM.

Billy C. Harris and his wife brought this action against the United States under the Tucker Act, 28 U.S.C. § 1346(a) (2), alleging the "taking" by the Government of a 5.1 acre tract of ground near a lock and a dam on the Arkansas River in Sebastian County, Arkansas. The case was tried to the court which determined there had been no taking and entered judgment for the Government. We affirm the judgment of the trial court.

The Harrises purchased a 5.1 acre tract about one-half mile south and west of the Arkansas River on September 18, 1959, and have owned it continuously since. This land is 1,320 feet in length and is 60 feet wide at the west end and 100 feet wide at the east end. Harris is a contractor and used the tract as a source of sand and as a dumping ground for stumps, concrete and other refuse. He excavated a large portion of the land (by removing sand) to a depth of six to ten feet, taking the last sand from the tract sometime in 1968 or 1969.

Mr. Harris testified that prior to December of 1969, when the Corps of Engineers closed a nearby dam at Lock 13 on the Arkansas River, he was able to excavate and remove sand with a front-end loader from a road that ran down through the middle of the excavated portion of the tract; that prior to the dam closing, water sometimes stood for short periods of time after a heavy rain, but would flow out rapidly; that after the dam at Lock 13 was closed, water was in the area at all times at depths up to ten feet; that it was no longer possible to take sand out except by a dragline which would not be feasible; that he could still use the property for dumping waste material, but had to restrict the type of·material dumped there. Two of

Harris' employees also testified that it was possible to take sand from the tract prior to late 1969, but not feasible thereafter.

Government witness Albert Moore testified that in early 1969 the "north" end of the tract had been excavated down into the water and that there was water standing in the tract in 1967, 1968, and 1969. Another Government witness, Stewart Osborn, testified that "on the north end there has always been water" during the five years he has been around the pit and that Harris was filling the south end of the tract. He also testified that Harris had not hauled any "dirt" out of it for two years preceding the trial in August of 1971.

Expert testimony by engineers and a geologist was offered by both parties. From this testimony, it is clear that the average elevation of the unexcavated portion of the Harris land is between 395 and 400 feet above sea level; that the normal pool elevation of the water in the river is 392 feet above sea level; that there is an observation well located about 200 feet west of the west portion of the Harris tract at which ground water level readings have been taken semiannually since 1959; that those readings have varied from a high of 396.5 feet in 1959 to a low of 380.5 feet in 1964 and 1967; that in March, 1968, the reading was 390 feet; September, 1968, 387 feet; March, 1969, 392 feet; September, 1969, 387.5 feet; February, 1970, 391 feet; and September, 1970, 393 feet. It is obvious from this evidence that the level of ground water in the observation well, immediately west of the Harris property, was higher than the lower levels of the excavated portion of the Harris tract in March of 1968 and March of 1969, and that in February of 1970, after the dam had been closed, it was lower than it had been in March of 1969, prior to the closing of the dam. A photo taken in September of 1968 and admitted into evidence, appears to show water standing in a portion of the excavated area.

Judge Williams, who personally viewed the tract in question, found that: "When

Lock and Dam 13 were placed in operation on the 20th day of December 1969, the water level of the Arkansas River ½ mile away was raised 2 feet. The water in the excavated part of the sand pit became a little deeper about the same time." He further found that "there is no substantial degree of injury resulting from the navigational improvements on the Arkansas River," and in support of that conclusion, he found that Harris had quit using the pit for sand purposes in 1969, and "had already excavated down to water level on the greater part of the 1320 foot strip, leaving only a portion approximately 100 feet by 60 to 70 feet; and we find that water already standing in the excavated part had been deepened less than an estimated two feet." Judge Williams also found: "His capability of recovering sand has not been taken. Consequently as a fact, his property has not been taken, as that term is used in Eminent Domain."

 Upon our consideration of the entire record, we cannot say that we are left with the definite and firm conviction that Judge Williams was mistaken in his findings. Long v. Board of Education, 456 F.2d 1058, 1059 (8th Cir. 1972) ; see Fed.R.Civ.P. 52(a). And if those factual determinations, as set forth above, are correct, under the applicable law there has been no taking by the Government.

In North v. United States, 94 F.Supp. 824, 825 (D.Utah 1950), facts similar to this case were presented when the plaintiff claimed that flooding of his cellar occurred after the Government built a dam which raised the ground water level and interfered with the free and natural underground flow of ground waters. Plaintiff's home was not adjacent to the river but was 500 feet away and no waters backed up onto his land. The court held that there was no taking within the meaning of the fifth amendment.

"[I]n order to constitute a 'taking' there must be: (A) a direct invasion of plaintiff's property by the waters of the government; and (B) that the invasion of such waters must be permanent so that the lands of the plaintiff are practically destroyed or that the invasion is a recurrent one amounting to an easement. Otherwise, the damage, if any, is consequential and amounts to tort only." [1] Id. at 825.

 A distinction is therefore to be drawn between mere tortious invasion of one's property rights and an appropriation of sufficient magnitude to amount to a taking. See National By-Productions, Inc. v. United States, 186 Ct.Cl. 546, 405 F.2d 1256, 1273–1274 (1969). Although there is no concise rule readily applicable to all cases, a taking must at least amount to a *substantial* interference with the property so as to destroy or lessen its value. See generally 2 Nichols, Eminent Domain §§ 6.1[1], 6.3 (3d ed. rev. 1970). And it is such an injury that the trial court failed to find present in this case.[2]

The trial court's denial of the claim is affirmed.

1. There was a direct invasion of the farmland involved in United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950), relied upon by the Harrises, by a rising water table, as well as blocked drainage. The Court pointed out that, "The destruction of land value, without some actual invasion of the land and solely by preventing the escape of its own surface water, is not before us." Id. at 810, 70 S.Ct. at 891.

2. We therefore need not determine whether the change of water level in Harris' excavation was subject to the navigational servitude attendant to the power of the Government in improving navigation.