**P. F. Z. PROPERTIES, INC., Plaintiff,**

**v.**

**Russell E. TRAIN et al., Defendants.**

**Civ. A. No. 74–1534.**

United States District Court,
District of Columbia.

April 30, 1975.

George L. Edgar, Fred F. Fielding, Washington, D.C., for P. F. Z. Properties, Inc.

Carl Eardley, Washington, D.C., for Commonwealth of Puerto Rico.

John E. Varnum, Thomas C. Lee, Dept. of Justice, for Train & Callaway.

David G. Hawkins, Washington, D.C., Pedro J. Saade Llorens, Hato Rey, P.R., for Juan Jose Calderon, Santiago Quinones, Haydee Romero Clemente, Ramon Ayala Tapia, Ramona Cruz DeJesus, Ernesto Calderon Rivera, Marcos Moreno Ayala, Andres Perez Sanjurjo, Carmen Clemente Calderon, Rafael Franqui Romero, Nicolasa Escalera and Rafael Verdejo Escalera.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

### Introductory Statement

On October 21, 1974, plaintiff brought suit against the Administrator of the Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) seeking declaratory and injunctive relief. Plaintiff seeks a declaratory judgment that the defendants have acted in violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., and the Puerto Rican Federal Relations Act, 48 U.S.C. § 731 et seq., in attempting to exercise jurisdiction over certain waters on property owned by plaintiff at Vacia Talega near San Juan, Puerto Rico. Plaintiff proposes to develop these acres, now covered primarily by mangrove wetlands, into an apartment-hotel-condominium complex, known as the "Vacia Talega Project."

This suit stems from the issuance by the EPA of a Notice of Violation and Order on September 19, 1974, informing plaintiff that certain of its preliminary development activities were in violation of the Federal Water Pollution Control Act (FWPCA), and directing plaintiff to cease its discharges of fill and biological material into waters of the United States without a permit from the Corps.

On October 21, 1974, plaintiff filed motions for a temporary restraining order and preliminary injunction seeking a declaratory judgment that the defendants did not have jurisdiction over the Vacia Talega waters. Plaintiff also sought injunctive relief proscribing the defendants from "seeking civil or criminal penalties" against plaintiff for its

activities, and from "seeking to enforce" the Notice of Violation and Order.

On October 21, 1974, a hearing was held on plaintiff's motion for a temporary restraining order, and that motion was denied. On October 29, 1974, a hearing was held on plaintiff's motion for a preliminary injunction. The Court denied this motion and denied defendants' motion to dismiss.[1] A nonjury trial on the merits of the complaint was held on January 20, 1975 through January 24, 1975.

The parties addressed themselves to two main issues at trial. The first is whether the waters of the Vacia Talega property are "waters of the U. S." within the meaning of the FWPCA. If so, the federal regulatory jurisdiction extends to those waters and the EPA's Notice of Violation and Order was lawfully issued. If not, the waters of the Vacia Talega are beyond the federal regulatory powers, and thus the EPA acted outside its statutory authority in issuing its Notice of Violation and Order. The second issue is whether the Puerto Rican Federal Relations Act, 48 U.S.C. § 731 et seq., precludes application of the FWPCA in Puerto Rico to waters not navigable within the traditional definition of navigable waters of the U. S., i. e., waters not navigable in fact.

Plaintiff and plaintiff-intervenor sought at trial to show that the defendants' actions in asserting jurisdiction over the Vacia Talega mangrove wetlands were arbitrary, capricious, or otherwise not in accordance with law for numerous reasons, including the present non-navigability of waters within the Pinones Vacia Talega Mangrove Forest, the insignificant likelihood that discharge of pollutants would reach navigable waters, and that the ecological impact of the proposed project would not adversely affect or destroy the biological integrity of navigable waters near the construction site.

The defendants rely on three grounds in asserting jurisdiction over the mangrove wetlands. First, they assert that the Vacia Talega mangrove wetlands are navigable waters of the U. S. by virtue of an unnamed canal, which was used for commercial purposes in the past, extending to the northeast through the Vacia Talega project site from the Canal de Tierra. Second, they assert that the waters of the Vacia Talega mangrove wetlands are "waters of the U. S." within the meaning of the FWPCA, because those waters flow to the Laguna de Pinones and, thus, are a potential source from which pollutants may flow to the Laguna de Pinones and the ocean. Third, they assert that the Vacia Talega mangrove wetlands are "waters of the U.S." within the meaning of the FWPCA by virtue of the biological productivity of these mangrove wetlands and their vital contribution to the biological vitality of the lagoons and the Atlantic Ocean.

The pleadings, pretrial stipulations, and evidence presented at trial establish the following.

## FINDINGS OF FACT

1. Plaintiff, P. F. Z. Properties, Inc. (PFZ) owns 1,358.65 cuerdas (1 cuerda is approximately 1 acre) located in the Torrecilla Ward of the Municipality of Loiza, approximately fourteen miles east of San Juan, Puerto Rico.

2. PFZ's property is at the eastern end of a large mangrove wetland of approximately 3,500 cuerdas commonly known as the Torrecilla-Pinones-Vacia-Talega Mangrove Forest.

3. PFZ plans to develop 266.41 of the 1,358.65 cuerdas into an apartment-hotel-condominium complex, known as the "Vacia Talega Project."

---

1. At this hearing the Court granted the motion of twelve residents of the Torrecilla Baja ward of the municipality of Loiza, which is located about 2½ miles to the west of the Vacia Talega project site, to intervene as defendant-intervenors. On January 8, 1975, the Commonwealth of Puerto Rico was admitted as plaintiff-intervenor.

4. Approximately 170 cuerdas of the 266.41 cuerdas on the Vacia Talega Project site are presently mangrove wetlands.

5. After lengthy hearings in which EPA was a participant, the Planning Board of the Commonwealth of Puerto Rico (Planning Board) approved on July 20, 1974, upon recommendation of the Environment Quality Board of Puerto Rico (EQB), an Alternate Preliminary Development Plan for the development of the 266.41 cuerdas comprising the Vacia Talega project site, subject to certain conditions including the requirement that construction plans be submitted within one year.

6. Beginning about August 28, 1974, plaintiff employed a contractor to conduct soil borings within the 266 cuerdas of the Vacia Talega project site in order to obtain necessary information to develop construction plans for the project for submission to the Planning Board. The soil borings were required to determine soil properties in order that structural foundations for buildings and utilities could be properly designed. Continuing through September 20, 1974, the contractor cleared or cut several 75–100 foot wide paths through the mangrove vegetation in order to transport equipment to the drilling sites for the core borings. Several paths were cleared with a bulldozer and others with a dragline. This work necessarily entailed the deposit of sand, rocks, and other dredged material into the waters of the Vacia Talega Project site.

7. On August 23, 1974, the local director of EPA sent a letter to the Executive Director of the EQB of Puerto Rico which indicated that EPA would undertake an investigation to determine whether it should seek an injunction from the U. S. District Court in San Juan if physical activity within the Vacia Talega project site were undertaken without a dredge and fill permit from the Corps. On August 27, 1974, the Executive Director of the EQB sent a letter to the local director of EPA which indicated his belief that activities conducted within the Vacia Talega project site would require a permit from the Corps, since a good portion of the project site was periodically flooded by high tides.

8. On September 6, 1974, the Corps sent a letter to plaintiff which indicated that the Vacia Talega project site was a low marshy area which "could be subject to the Corps regulatory jurisdiction under Section 404 of the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92–500), and should you propose to include water access for the areas or to construct piers, bulkheads, or other water oriented structures, it would also be subject to our regulatory jurisdiction under Section 10 of the River and Harbor Act of 1899." The letter requested information in order to determine whether a dredge and fill permit would be necessary.

9. On September 13, 1974, EPA's local director was advised by the Executive Director of the EQB of Puerto Rico the PFZ was performing certain work at the Vacia Talega project site.

10. On September 15, 1974, EPA's local director initiated an investigation of the activities which were being conducted at the Vacia Talega project site. The local director inspected and photographed the work being performed from the ground and from a helicopter. On September 17, 1974, representatives of EPA and the Corps inspected the work site.

11. On September 19, 1974, the EPA issued plaintiff a Notice of Violation and Order informing plaintiff that certain of its preliminary development activities were in violation of the FWPCA, and directing plaintiff to cease its discharges of fill and biological material into waters of the U. S. without a permit from the Corps pursuant to Section 404(a) of FWPCA, 33 U.S.C. § 1344(a).

The EPA Order [2] was issued pursuant to Section 309(a)(3) and (4) of the FWPCA, 33 U.S.C. § 1319(a)(3), (4).

12. Immediately upon service of EPA's September 19, 1974 Order, plaintiff stopped all activities at the Vacia Talega project site.

13. On January 14, 1975, the Corps issued a determination of navigability for the Vacia Talega-Pinones mangrove wetland, which includes the mangrove forest on the Vacia Talega project site. The Corps therefore concluded that the mangrove forest was within its jurisdiction. The Corps' determination of navigability rested upon its factual finding that (a) in the past, goods were transported by boat from the Vacia Talega project site, via existing canals to the Pinones Lagoon and points west, in interstate commerce, and (b) that the waters within the Vacia Talega project site were covered by a continuous sheet of water during periods of "ordinary high water." The Corps also found that the waters within the Vacia Talega project were not subject to tidal influence.

*Findings of Fact Re Whether the Waters of the Vacia Talega Mangrove Forest are Navigable Waters of the United States*

14. Several canals, including the Canal de Tierra, the Canal del Medio, and an unnamed branch canal extending from the Canal de Tierra in a northeasterly direction into the Vacia Talega Project site, connect the Vacia Talega wetlands with the Laguna de Pinones,

---

2. The September 19, 1974 EPA Notice of Violation and Order contained, among others, the following findings of fact:

P.F.Z. Properties, Inc. is a corporation, incorporated under the laws of the Commonwealth of Puerto Rico, with headquarters at El San Juan Hotel, Carolina, Puerto Rico.

P.F.Z. Properties, Inc. owns 1356 cuerdas (acres) in the Pinones-Vacia Talega Area, so designated by the Puerto Rico Planning Board. The area in question is located on the North Coast of Puerto Rico. It is bordered by the Boca de Congrejos outlet on the west; the ocean front on the north; the Rio Grande de Loiza on the east; and extends south at varying distances between three to four kilometers from the coast.

P.F.Z. Properties, Inc. intends to undertake a stage by stage development of the aforementioned property, with the ultimate goal of converting the entire area into a hotel apartment community complex.

Tremols General Contractors, under contract with P.F.Z. Properties, Inc., has been authorized by P.F.Z. Properties, Inc. to commence the necessary excavating work on the first development site which occupies 214 cuerdas in the north-east sector of the Pinones-Vacia Talega Area. An estimated 60 percent of the 214 cuerdas is covered by mangroves. This mangrove area is at the extreme end of a mangrove forest and lagoon system which originates at Boca de Congrejos inlet.

In accordance with the requirements of the Puerto Rico Planning Board, P.F.Z. Properties, Inc. has filed an "Environmental Impact Statement for the Vacia Talega Community Project." Section I, C, 3 of this document states that observations made at the site revealed some correlation between tidal rise and a similar rise in the levels in canals within the mangrove area; tidal lines were also seen on the roots of the mangroves.

Aerial and on-site inspections conducted on September 16 and 17, 1974 by representatives of the U. S. Environmental Protection Agency, the Puerto Rico Environmental Quality Board and the U. S. Corps of Engineers revealed extensive clearing of the mangrove trees and dredging operations being presently undertaken by Tremols General Contractors for P.F.Z. Properties, Inc. These inspections also revealed that dredged spoils are being dumped in the mangrove forest by Tremols General Contractors.

The point source discharge of the cleared and dredged materials by Tremols General Contractors for P.F.Z. Properties, Inc. into adjacent mangrove areas obstructs the flow of the waters of the United States.

As neither the operator, Tremols General Contractors, nor the property owner, P.F.Z. Properties, Inc., have a permit from the U. S. Army Corps of Engineers to discharge dredged or fill material in accordance with Section 404 of the FWPCA, the discharge of said material into the aforementioned mangrove wetlands constitutes a violation of Section 301(a) of the FWPCA (33 U.S.C. § 1311(a)).

the Laguna la Torrecilla and with the Atlantic Ocean. The outline of these canals is shown in defendants' Exhibits 3, 4, 5, 6, 7 and 8.

15. These canals were navigated for commercial purposes from at least the early 1900's up until the 1930's or 1940's when a bridge was built across the Boca de Congrejos which permitted a road connection between the Loiza River and the Pinones Lagoon. The testimony of defendants' witness Ramon Moreno shows:

(a) Mr. Moreno, now 59 years old, was born and raised in the Pinones area, as were his parents. He worked in the Torrecilla-Pinones-Vacia-Talega mangrove forest 31 years from 1928-1959.

(b) Mr. Moreno and the other workers in the Torrecilla-Pinones-Vacia-Talega mangrove forest used the Canal de Tierra and the branch canal extending into the Vacia Talega project site to transport railroad ties, charcoal, crabs and vines during the 1930's and 1940's.

(c) It can reasonably be concluded that the canals which Mr. Moreno described in his testimony are the Canal de Tierra and the unnamed branch canal extending northeasterly through the Vacia Talega project site from the Canal de Tierra which connect to the Laguna de Pinones and ultimately the ocean. The canals are shown on the 1937 and 1961 aerial photographs of the Pinones-Vacia Talega area.

(d) The Canal de Tierra, at the time of Mr. Moreno's description, was approximately 12–14 feet wide and approximately 4 feet deep. The branch canal was approximately 8–10 feet wide and 3 to 3½ feet deep.

(e) Workers in the mangrove forest navigated the branch canal in boats of up to 20 feet in length and 4 feet in width. Larger boats of up to 30 feet in length were used on the wider portions of the Canal de Tierra from the Laguna de Pinones to the trail from the beach to the Juan Perez Island.

(f) Mr. Moreno and many other workers used the branch canal for several commercial purposes.

(g) Railroad ties were made from hucar wood which was found buried in the mud in the mangrove swamp. The railroad ties were hand-carried from the Vacia Talega project site to the edge of the canal, and then transported by boat to the beach end of the unnamed branch canal where they were sold to Luis Enrique Biaschochea, owner of a farm, Monte Grande, a property of about 50 cuerdas located in the northwest corner of the Vacia Talega. Mr. Biaschochea developed a thriving business, which extended over the years 1936 through 1941, manufacturing and supplying railroad ties to sugar mills upon order in lots of 100 or more. The railroad ties were transported by way of the canals to Hoya Molas, a port at the southern end of the Laguna de Pinones. Mr. Moreno also testified that he saw others take the railroad ties within the project site and transport them by boat up the unnamed canal to a landing near the Punta Vacia Talega where Mr. Biaschochea would accept them.

(h) As many as 80 to 100 workers made charcoal on Mr. Biaschochea's property. Charcoal was produced in the mangrove forest and transported on water within the Vacia Talega project site to the beach. Mr. Biaschochea would buy the charcoal from the workers and transport the charcoal from the beach end of the unnamed branch canal to a warehouse at the beach end of the trail to Juan Perez Island. Mr. Biaschochea sold the charcoal after collecting it in small lots from the workers. Mr. Moreno also transported charcoal by boat from the Vacia Talega area to points on the Laguna San Jose. On occasion he sold the charcoal to the public on the streets of the areas around Santurce, just outside Old San Juan.

(i) Crabs were collected within the Vacia Talega project site and transported by water to his house on Laguna de

Pinones and then to points on the Laguna San Jose to sell to restaurants and the public.

(j) Vines, found in the mangrove forest on the Vacia Talega project site, were transported by the canals to the Boca de Congrejos and sold to fishermen for use as netting for fish traps and seines.

(k) Mr. Biaschochea appeared as a witness and his testimony supported Mr. Moreno's concerning the commercial activities in the area of the Vacia Talega Project. Mr. Biaschochea's denial of the existence of an extensive canal system throughout the mangrove swamps is at variance with the physical evidence and the testimony of Mr. Moreno and, in this respect, cannot be credited.

(l) Mr. Moreno's testimony on the navigability of the Canal de Tierra and branch canal is circumstantially corroborated by certain other items of evidence adduced at trial:

(1) A translation of a Spanish document entitled "Canal from Loiza to the Pinones Lagoon" printed in the *Official Bulletin* of the Spanish administration in Puerto Rico, and dated September 28, 1841, which stated that on July 17, 1841 the government of Spain granted a license to several landowners in the Loiza area to open a canal from the Loiza River to the Laguna de Pinones in order to facilitate the transportation of their goods to San Juan. The document includes a description of the proposal canal. It was to be 24 feet wide and 12 feet deep and would allow the farmers to avoid the ocean route to the City of San Juan. (Defendants' Exh. 67).

(2) The doctoral dissertation written in 1937 at the University of Chicago by Marguerite Uttley entitled "Land Utilization in the Canovanas Sugar District, Puerto Rico" substantiates Mr. Moreno's testimony concerning the production of railroad ties and charcoal in the mangrove swamp and the transportation of the wood on the canal system. Defendants' Exhib-

it 27 shows clearly as navigable watercourses the Canal de Tierra and the Canal del Medio (as they are named on the Carolina quadrangle, Defendants' Exh. 3). Ms. Uttley described the transportation in the Pinones-Vacia-Talega mangrove forest in 1937 in these terms:

Transportation of wood through the swamps continues as in days of old on the canals constructed in the 1840's. In flatbottomed boats, loads are poled along the shallow canals into Laguna Pinones, which is only two or three feet deep. There are connections from lagoon to lagoon, so that it is possible to pole from the swamps west of the Loiza River all the way to a shallow arm of the bay of San Juan. Over this route sacks of charcoal and bags of coconuts go to the city. (Defendants' Exh. 27, page 37).

(3) The testimony of Mr. Peter Anderson, an hydrologist employed by the EPA, who confirmed the existence of the Canal de Tierra and the branch canal by walking the branch canal from its nearest contact with the beach, which is on the Vacia Talega Project site, to the Canal de Tierra and on to the Laguna de Pinones. In general the branch canal was 4 feet wide and 7 inches to 4 feet deep. He found the Canal de Tierra to vary between 8 and 15 feet wide between its juncture with the branch canal and the Laguna de Pinones. These canals are now overgrown with roots and mangrove trees.

16. The physical characteristics of the canals and the extensive navigation on these canals demonstrate that the Canal de Tierra and the branch canal were susceptible in the past for use in interstate and foreign commerce. The Corps of Engineers' determination of navigability is supported by substantial evidence.

17. The Torrecilla-Pinones-Vacia-Talega mangrove forest is covered by a continuous sheet of water from the La-

guna de Pinones to the Vacia Talega Project site. Except for periods of drought, the mangrove wetlands in the Vacia Talega Project site are covered by water for the entire year, which waters are at or below the ordinary high water mark of the branch canal. This finding is supported by:

(a) the testimony of several eyewitnesses—Cerame, Lugo, Clevenger and Goode;

(b) The statistical evidence of a rainfall deficit from September, 1973 to September, 1974 which was not overcome by the above normal rainfall in October and November of 1974;

(c) The 30-year study of normal rainfall and evapotranspiration (total water loss from the swamp due to transpiration by vegetation and atmospheric evaporation) patterns indicating there is more precipitation than evapotranspiration for most periods of the year resulting in standing water in the mangrove wetlands;

(d) Biological indicators (pneumatophores and lentocils) tending to grow to a uniform height just above the normal range of water levels and showing that the water levels in the mangrove swamps were within the normal range of water fluctuations.

*Findings of Fact Re Whether the Waters of the Vacia Talega Project Site are "Waters of the United States"*

18. The waters of the Vacia Talega Project site are a potential source of pollution to traditional navigable waters. This is because, at times of high waters or less, water from the Vacia Talega Project site flows westward to the Laguna de Pinones and gas, oil or other pollutants discharged in the waters of the Vacia Talega Project site will likely flow into the Laguna de Pinones. This finding is supported by the testimony of Peter Anderson, an hydrologist with EPA, based upon:

(a) Dye tests showing that waters of the branch canal tend to flow to the southwest down the canal to the Canal de Tierra;

(b) A water budget showing that, after making an allowance of water loss through evapotranspiration, a minimum of 6 to 21 inches of water flows from the Vacia Talega mangrove forest over the course of a year;

(c) Tests of salt concentrations in the Vacia Talega mangrove forest, indicating that the low to moderate salinity of waters in the mangrove forest is accountable only by a regular flow of water from the Vacia Talega mangrove forest. Without such flow, these waters would be much more saline, since salt entering the forest from the ocean does not evaporate as does rain and other water;

(d) The survey showing the elevation of the water in the Vacia Talega mangrove forest to be 2.76 feet above mean sea level on December 5, 1974. Since there is a continuous sheet of water between the project site and the Laguna de Pinones, waters from the Vacia Talega project site must, by force of gravity, flow from the project site into the lagoon;

(e) Studies indicating the export from the project site of large quantities of detritus (decomposed leaf material) out of an annual production of 5.7 tons per acre per year. This export takes place by means of water flowing from the project site to the Laguna de Pinones.

19. The destruction of the Vacia Talega mangrove forest would impair the biological integrity of nearby navigable waters of the United States. This finding is supported by:

(a) Evidence that coastal mangrove forests are vital to the mainte-

nance of a healthy marine environment and that Vacia Talega mangrove forest is an important part of the coastal ecosystem providing food and shelter for juvenile fish later finding their way to the lagoons and the ocean. The entire Torrecilla-Pinones-Vacia-Talega mangrove forest is Puerto Rico's largest remaining mangrove forest;

(b) Evidence that construction of the Vacia Talega Project will not only destroy the forest on the project site, constituting approximately 8–10% of the entire mangrove forest, but may well have an adverse effect on the remaining mangrove forest, particularly since existing drainage patterns have not been studied and are not known. Pollutants resulting from the use of heavy construction equipment if allowed to drain into the mangrove forest might well be seriously harmful to the remaining forest.

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction over the present controversy by virtue of 28 U.S.C. §§ 1331(a), 1337 and 5 U.S.C. §§ 701–706 (1970).

■ 2. A body of water is "a navigable water of the United States" if (1) it presently, or (2) has been or was in the past, or (3) could be made in the future by reasonable improvements, susceptible for use in interstate or foreign commerce. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1941).

■ 3. The types of commercial use sufficient to establish whether a body of water is navigable water of the United States will vary with the character of the region, its products, and the difficulties of navigation. A small amount of commercial traffic compared to the available commerce of the region is sufficient; the true criterion is capability, rather than time, manner, or extent of use. United States v. Appalachian Electric Power Co., *supra*.

■ 4. The waters of the Vacia Talega were used in the past for many years as a highway of substantial commerce. Railroad ties, charcoal, crabs and vines were transported via the canals within the Vacia Talega waters. The markets available for the railroad ties and charcoal suggest that the goods were transported on water within the Vacia Talega project site for sale to companies engaged in interstate commerce. The commercial activity therefore had an effect on interstate commerce.

■ 5. Once a body of water has been determined to be navigable, it remains so notwithstanding the fact that it is no longer used for commercial purposes or is presently incapable of such use because of changed conditions or the presence of obstructions. Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

■ 6. The branch canal and Canal de Tierra are navigable waters of the United States.

■■ 7. Once a finding of navigability is made, the "traditional" federal regulatory powers extend in nontidal waters to the ordinary high water mark of the water. Borough of Ford City v. United States, 345 F.2d 645, 648 (3d Cir., 1965), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965). The evidence shows that, except for periods of drought, a continuous sheet of water extends from the branch canal and Canal de Tierra across the entire mangrove swamp within the Vacia Talega Project site. Water flows from the Vacia Talega Project site toward the Laguna de Pinones and the ocean. Although an exact line of ordinary high water cannot be ascertained along the edge of the Vacia Talega mangrove forest, the entire Vacia Talega mangrove forest is under water for virtually all of a normal year and, thus, must be below

the ordinary high water mark of the branch canal and Canal de Tierra. The entire mangrove forest on the Vacia Talega Project site and the waters thereon are, therefore, within the federal jurisdiction. United States v. Kansas City Life Insurance Company, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Claridge, 416 F.2d 933, 934 (9th Cir. 1969).

8. The FWPCA Amendments of 1972, in expanding jurisdiction over all waters of the United States, regardless of navigability, amplified the previous federal statutory authority relating to water pollution. The 1972 Amendments to the Act prohibit the discharge of a pollutant by any person unless permitted otherwise in the Act, and reach all waters of the U.S. in the geographic sense in order to control pollution at its source. United States v. Holland, 373 F.Supp. 665 (M.D.Fla.1974). Congress passed the Act "to restore and maintain the chemical, physical and biological integrity of the nation's waters," 33 U.S.C. § 1251(a), and, toward that end, the Act has been interpreted to extend federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution. Natural Resources Defense Council v. Callaway, Gribble, and Train, 392 F.Supp. 685, Memorandum decision by Judge Robinson (D.C. D.C.1975). The 1972 Amendments to the FWPCA thus extend federal authority over water pollution beyond the mean high tide line. By recognizing federal authority to act when offensive matter is discharged from any "point source," 33 U.S.C. § 1362(14), the government is authorized to prevent the *entry* of pollutants into navigable waters. United States v. Holland, *supra.*

9. The FWPCA was designed to exercise federal regulatory jurisdiction over activities which impair navigable waters. The Act was enacted to prevent the entry of pollutants into navigable waters and, to this end, pollution must be controlled at its source before

the pollution endangers our coastal environment.

10. The Government's power extends to the protection of wildlife and natural resources in navigable waters, as well as to the protection of navigation. Zabel v. Tabb, 430 F.2d 199 (5th Cir., 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808. The inclusion of ecological factors in the determination of whether the Corps should grant a construction permit allows for the denial of a permit on purely ecological, rather than navigational, grounds.

11. The waters of the Vacia Talega project are "waters of the United States" within the meaning and intent of the FWPCA.

12. The construction of the Vacia Talega project will threaten the biological integrity of the Laguna de Pinones and the Atlantic Ocean. Moreover, the construction of the project is likely to harm substantially the remaining mangrove wetlands and will reduce the food production capacity of the mangrove wetlands on which the fish and other aquatic organisms of the canals, lagoons and ocean depend, thereby seriously disrupting that coastal ecosystem.

13. The discharges of sand, rock, biological and dredged material by means of a dragline and bulldozer into the mangrove wetlands at the Vacia Talega project site in mid-September, 1974, constitute violations of Section 301(a) of the FWPCA, 33 U.S.C. § 1311(a).

14. PFZ is required to obtain a permit under 33 U.S.C. § 1344 from the U. S. Army Corps of Engineers for the discharge of any fill, biological or spoil material into the mangrove wetlands on the Vacia Talega project site before proceeding to do any further such work on the project site.

15. The issuance by defendant Train of the Notice of Violation and Order dated September 19, 1974, was a proper exercise of his authority under

Section 309(a)(3), (4) of the FWPCA, 33 U.S.C. § 1319(a)(3), (4).

16. The determination of the U. S. Army Corps of Engineers on January 14, 1975 that the waters on the Vacia Talega Project site are navigable waters of the United States and, thus, within the federal jurisdiction pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and the FWPCA is a proper exercise of the Corps of Engineers' regulatory authority under those statutes.

17. The Puerto Rican Federal Relations Act does not affect in any way the Federal Government's regulatory powers over navigable waters of the United States.

18. Plaintiff's prayers for injunctive and declaratory relief are in all respects denied.

An Order consistent with the foregoing has been entered this date.