**USI PROPERTIES CORP., Plaintiff,**

**v.**

**The ENVIRONMENTAL PROTECTION AGENCY, the United States of America and the Department of the Army, Corps of Engineers, Defendants.**

**Civ. No. 80–2329.**

United States District Court,
D. Puerto Rico.

July 14, 1981.

Rubén T. Nigaglioni, Nigaglioni, Palou & Ledesma, Hato Rey, P. R., for plaintiff.

Vivian Reyes, Asst. U. S. Atty., Hato Rey, P. R., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

CEREZO, District Judge.

On October 11, 1980 the Environmental Protection Agency (EPA) issued a cease and desist order under the authority of Section 309(a)(3) of the Clean Water Act of 1977, 33 United States Code, Section 1319(a)(3)[1] averring that plaintiff USI Properties Corp., owner of a property in Humacao, Puerto Rico known as the Santa Teresa farm, in conjunction with other corporations engaged in a common project to develop the land for residential purposes, was violating Section 301(a) of the Act, 33 United States Code, Section 1311(a) in that without having obtained a permit from the U. S. Army Corps of Engineers they were discharging dredged or fill material into wetlands found within the bounds of the Santa Teresa property and without having a permit from EPA were discharging pollutants into the Frontera Creek and the Caribbean Sea which are navigable waters of the United States. This order was issued after on-site inspections by EPA representatives on October 2 and October 10, 1980 and contains the following pertinent findings of fact:

---

1. Section 1319(a)(3) provides that:

"Whenever on the basis of any information available to him the Administrator finds that any person is in violation of section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or in violation of any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by him or by a State or in a permit issued under section 1344 of this title by a State, he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section."

"VI

U.S.I. Properties owns approximately 370 acres of land in the El Morillo and Santa Teresa sectors in Humacao. The area in question is located in the east coast of Puerto Rico. It is bordered by State Road No. 3 on the north, by the Caribbean Sea on the south, by the Mandri Creek on the east, and by privately owned land on the west.

VII

The aforementioned area has been determined by the Puerto Rico Department of Natural Resources and the U.S. Environmental Protection Agency to be navigable waters of the United States and a wetland as saturation of water is the dominant factor determining soil development and the species, both plant and animal, that live in the soil and on its surface. There are a number of lagoons in the area.

VIII

A pump station located in the area is used to drain water out of the lagoons and the Mandri Creek which is discharged into the Frontera Creek and eventually into the Caribbean Sea.

IX

U.S.I. Properties intends to develop the aforementioned property with the ultimate goal of converting the area into a low income housing project.

X

The area has been classified by the National Flood Insurance Program as floodplain. The development planned for the area requires that substantial amounts of fill material be placed prior to the construction of the dwellings.

XIV

In the land clearing, land filling and construction activities, M.D. Construction and A.U. Development will be bulldozing, collecting, gathering and transporting sheared trees, vegetation, soil and leaf litter across the wetlands. They (sic) also be transporting fill material and sand across the wetlands.

XV

An on site inspection conducted on October 2, 1980 by a representative of the U.S. Environmental Protection Agency revealed that a concrete and steel bridge is under construction over the Frontera Creek approximately 0.2 miles from the Caribbean Sea. The bridge foundation and structural supports have been built to withstand heavy loads. The area was found to be a wetland habitat for many species of wildlife. The inspection also revealed that the existing pumps located at the lowest point of the lagoon system, seemed to be ready for operation. The water at the wet well of the pump house was found to be a dark orange appearance from silted material suspended in it.

XVI

An on site inspection conducted on October 10, 1980 by representatives of the U.S. Environmental Protection Agency revealed that the above referred pumps were being operated. As a result of the operation of the pumps, the U.S. Environmental Protection Agency representatives found that a dark green substance was being discharged in the Caño Frontera and eventually in the Caribbean Sea. The pumps were pumping 110,000 gallons of water per minute off the wetland into the Frontera Creek and eventually into the Caribbean Sea.

XVII

The October 10 inspection by U.S. Environmental Protection Agency representatives also revealed land clearing and dredging activities. Fill material and sand were also being transported across the wetland.

## XVIII

In light of the results of EPA's intensive water quality survey conducted on Caño Frontera on October 24, 1979 which showed high mercury concentrations in the sediment of the Caño Frontera, the USEPA believes that any resuspension of this sediment, likely to be caused by the pumping operations, could result in the uptake of mercury in the food chain creating a health hazard.

## XIX

The point source discharge of the cleared and dredged materials by A.U. Development and M.D. Construction into adjacent wetland areas obstructs the flow of the waters of the United States.

## XX

The above activities constitute a discharge of dredged materials under the Clean Water Act.

## XXI

The pumping operations into the Frontera Creek and the Caribbean Sea constitute a discharge under the Clean Water Act."

Having found that these activities were conducted without a permit, EPA ordered USI Properties Corp. "to cease any operations, pumping, land clearing, construction or any other activities that will lead to the discharge of pollutants into waters of the United States or to the discharge of dredged or fill material into navigable waters, to wit: the wetlands within the area designated as El Morillo and Santa Teresa in Humacao and lying within the property owned by U.S.I. Properties as described in paragraphs VI and VII above." On November 7, 1980 U.S.I. Properties Corp. filed an unverified complaint against EPA charging that "the defendant lacks statutory authority to issue the aforementioned order and said order is null and void as the pumping operation is not taking place in waters of the United States, no pollutants are being discharged into waters of the United States as provided in the Clean Water Act, and plaintiff's property is excluded from the provisions of the Clean Water Act, pursuant to 40 CFR Part 122.4." Plaintiff invokes federal jurisdiction under the Federal Water Pollution Control Act, 33 United States Code Section 1251, et seq., as amended by the Clean Water Act of 1977, and under the Administrative Procedure Act, 5 United States Code Section 702. This action, however, has not been filed to seek enforcement of the Clean Water Act since plaintiff's basic contention is that its property is not covered by the Act. This contention is not primarily based on the assertion that the property falls within those areas or activities expressly excluded by the Act but rather on the view that the property has neither wetlands nor other navigable waters of the United States, as those terms are defined in the Act. In any event, plaintiff in its original and in its amended complaint, both unverified, seeks injunctive relief against EPA pursuant to Rule 65 of the Federal Rules of Civil Procedure in the form of a temporary restraining order to enjoin the agency from interfering with the pumping of water from its property into Caño Frontera. The amended complaint also sought the quashing of the order to cease and desist, a preliminary injunction against agency action which interfered with the pumping until the case was heard on the merits and "a hearing ... for the issuance of a permanent injunction to prevent the unlawful exercise of jurisdiction by the defendants over plaintiff's property under color of the provisions of the Clean Water Act."[2]

The basic allegations in support of injunctive relief are that the property has been used for agricultural activity and grazing pastures for at least fifty years and that for approximately an equal amount of time a pumping system has been used to drain it as well as adjacent lands. Allegation 9 of the amended complaint states that: "The water that accumulates in plaintiff's property and

2. Prayer for relief of the amended complaint.

adjacent tracts of land is pumped by the existing pumping system located in plaintiff's property to a tributary of the Frontera Creek, a man-made body of water that stands at a higher topographical level than plaintiff's property and empties into the sea." It is also alleged that during the last year and a half the pumps have been under extensive repair and were not operational causing unusually heavy precipitation to accumulate and that on or about October 10, 1980 the pumps were finally repaired and water was once again pumped from those lands. Plaintiff charges that the accumulation of excessive water poses a serious potential hazard to the physical well-being of the surrounding communities' life and properties since the saturation of water may cause catastrophic flooding conditions and possible loss of lives in the event of heavy rainfall and that the present flooding conditions are affecting the ecology of the area and the vegetation in plaintiff's property.

A hearing on a preliminary injunction commenced before Judge Gilberto Gierbolini was discontinued upon his disqualification because two parties which were interested in the final outcome of the case had been his clients while he was an attorney. The case was reassigned to the undersigned judge after pretrial memorandum had been filed and the preliminary injunction hearing was interrupted. In the meantime, a motion for intervention was filed by 3,000 residents of the lands adjacent to plaintiff's alleging that the order issued by EPA would bring upon them irreparable injury since the prohibition of the use of the pumps increased the danger of flood in that area and could possibly result in loss of their lives and properties. The residents sought injunctive relief in the same manner as plaintiff and, additionally, monetary relief for mental anguish estimated in the sum of $1,000,000. The motion for intervention was denied on February 12, 1981 upon the Court's determination that intervenors' claims would unduly complicate the issues and would hamper the prompt disposition of the action filed by U.S.I. Properties Corp. since intervenors filed a class action which required certification proceedings that would delay the future development and adjudication of the original action. The Court also noted that defendants had raised as a defense the failure of U.S.I. Properties Corp. to exhaust administrative remedies for it had not requested a permit from the agency, a defense which could not be raised against the intervenors. They subsequently filed an independent action, Civil No. 81–0379, seeking identical remedy as requested in their motion to intervene. A petition for a preliminary injunction was denied after a hearing and that case is pending amendment of the complaint in order to proceed to a trial on the merits of the permanent injunction.

The parties in this case were ordered to discuss during the hearing on defendants' Motion to Dismiss and/or for Summary Judgment the exhaustion doctrine and the issue of the alleged irreparability of damages. Although the Motion to Dismiss filed by defendants EPA and the United States is anchored on various grounds, the Court deems it necessary to discuss only the application of the doctrine of exhaustion to the present action.

The precise issue before the Court is whether the exceptions to the exhaustion requirement having to do with the infliction of irreparable harm or with the contention of asserted lack of agency jurisdiction are present in this case. On April 20, 1981 a hearing was held at which the testimony of experts presented by both parties and documentary evidence were received. Before that the Court conducted an on-site inspection of plaintiff's farm and the adjacent lands as part of the proceedings in Civil Action No. 81–0379 at which counsel and a representative of U.S.I. Properties Corp. were present and actively participated.

Plaintiff's property comprises an approximate total area of 450 acres known as the Santa Teresa farm in the Municipality of Humacao, Puerto Rico. An agreement was executed between A.U. Development Company and U.S.I. Properties Corp. to develop the Santa Teresa farm or, as stated by Mr. Donald Alberti, vice-president of U.S.I. Properties Corp., to study the development

of that property, at which time, if deemed feasible, plaintiff under a reservation of rights agreed to sell the property either to A.U. Development Company and/or a nominee of the company. Part of this property has been the object of a residential development known as Ciudad Cristiana I and the remainder is presently used as grazing pastures for a small herd of cattle and for the commercial exploitation of a coconut grove. Plaintiff conducts no other activity in the Santa Teresa farm. A phase II of the Ciudad Cristiana development has been proposed for the construction of 700 homes and plans have been submitted to the Planning Board of the Commonwealth of Puerto Rico which would involve approximately another hundred acres of the farm. There are two large lagoons or ponds lying at either side of Caño Frontera in plaintiff's property which have flooded a coconut grove killing approximately 800 palm trees. In the past plaintiff's property has been kept dry by the use of pumps located in a pumping station within the farm which were inoperative due to repairs during approximately a year and a half until October 1980. Plaintiff corporation has an agreement with an individual in the area to take coconuts out of its coconut grove at a value of $300 per month and due to the fact that many coconut trees have died his payment was reduced to $200 a month. Plaintiff has another agreement for the rental of a part of its farm for grazing purposes and due to the flooded condition of the farm there has been a reduction of the $2,000 yearly rent received to $1,000. Plaintiff's property is not dedicated to agriculture and with the exception of renting parts of the land for small-scale activities such as grazing and the sale of coconuts no other profit is derived from it. Mr. Alberti testified during the hearing that he did not believe that the area destined for the housing project to be known as Ciudad Cristiana II was under water and that the only step taken towards the development of such a project was the submission of the plans to the Planning Board. Upon questioning by defendants' attorney on whether plaintiff was planning to develop the whole area instead of leaving it as grazing land or as a coconut grove, he answered that in determining what was best for the tract of land they were looking ten to fifteen years into the future[3] and that no decision had been made as to what the final disposition of that property would be. He stated that he did not become aware that pumps were needed to keep the farm dry until the flooding caused by two tropical storms and the shutting down of the pumps occurred.

Dr. Máximo Cerame Vivas, plaintiff's expert, testified that from his observation of the Santa Teresa farm the wetlands species present covered less than 1% of the area. He observed that there are two patches of mangroves that have been there for a number of years and that there are mangrove trees along the banks of the creek, but not inside the property.[4] He did not dispute that the area that has the mangroves is a wetland and stated that "there are mangroves along the banks of this creek, and there are mangroves along this portion of the creek and there is some mangrove behind the dune in standing water."[5] He also recognized that there are wetland species in the Santa Teresa farm now that are beginning to take hold. On cross-examination, he stated that plaintiff's farm has wetland soil yet in his definition that does not make it a wetland. As Dr. Cerame Vivas put it, "I have stated myself that there is a wetland there, there are wetland species there, and there are mangroves there, yes. That does not comprise the whole property."[6] He later testified: ". . . Finca Santa Teresa is not a wetland in its whole extent" and that although "there are wetlands along the banks of the creek, the creek, the mouth of the creek and there are patches of man-

3. Transcript pages 24 and 25 of the April 20, 1981 hearing.

4. Pages 37 and 38 of the transcript of the April 20, 1981 hearing.

5. Page 38 of the transcript.

6. Page 49 of the transcript.

groves ... that does not make the whole finca a wetland."[7]

Dr. Ariel Lugo, an expert in wetlands presented by defendants, testified that in his opinion most of plaintiff's property is a wetland and that historically it has been a wetland.[8] He rejected the view that an ecological disaster was presently occurring in the area stating that as soon as the pumps stopped working nature restored the wetland condition and that the species of plants growing there point to the conclusion that wetlands do exist. He insisted that the hydrology, the plants, the animals and everything about the area point to the conclusion that it has been and shall continue to be a wetland and that it is only because the land has been dried artificially by humans who pumped the water out that the area appeared not to be one. He stated that when the pumping stopped "nature came back" and that "normally you [would] have a wetland."[9] In his opinion those coconut trees in plaintiff's farm that are dying were planted in the wrong area, i. e., in soils that have been classified in regional soil surveys of Puerto Rico as wetland soils. Other palm trees growing elsewhere on the farm are doing well.

Dr. Lugo discussed the ecological value of wetlands describing them as inter-phase ecosystems that support great varieties of fish, wildlife and plants and expressed that wetlands absorb floods. Should building or other development occur in wetland areas flooding is induced elsewhere because the buffering of the wetlands is thus eliminated. He referred to the legal definition of a wetland as an area that would under normal circumstances support a wetland and that were it not for the pumping, under otherwise normal conditions, the wetland is there. Upon ceasing of the pumping, 20 species of wetland vegetation and 40 species of fish and wildlife have appeared in the area which is, according to his testimony, the best evidence of the existence of a wetland.

It is against this factual background that we must decide the merits of defendants' motion to dismiss based essentially on the doctrine of exhaustion of administrative remedies. It is defendants' contention that plaintiff must utilize the administrative procedures available to it, specifically the permit procedures before EPA which would culminate in a determination by the agency on whether it will allow the activities which it ordered to cease in plaintiff's property. Defendants have argued that no irreparable injury will be caused by this action and that judicial interference with EPA proceedings is unjustified since there is no clear absence of agency jurisdiction. They point to the fact granted by plaintiff that the waters pumped from its farm are discharged into Caño Frontera which in turn empties into the Caribbean Sea. They also urge in support of EPA jurisdiction that what is in issue is not whether wetlands exist in plaintiff's property which could be affected by construction activity carried therein but rather the extension of those wetlands, a factual matter upon which the expertise knowledge of the agency should bear. They argue that EPA should be allowed to make the initial determination on the scope of the wetlands and the ultimate determination of whether the activities should finally be prohibited in a definite manner by the agency. Plaintiff, in turn, claims that the agency's action exceeds its jurisdictional authority since the waters accumulated in its property are not navigable waters of the United States. It refers to the activities outlined in the cease and desist order in the sense that fill material and sand were being transported across the wetland and that a concrete and steel bridge was under construction over the Frontera Creek approximately 0.2 miles from the Caribbean Sea as factually incorrect and understands that they remain to be decided by the Court at a hearing. It further contends that the determination of whether or not its property is a wetland within the definition of waters of the United States is a legal question for

7. Page 54 of the transcript.

8. Pages 63–64 of the transcript.

9. Pages 93–99 of the transcript.

the Court to decide and directly affects the jurisdiction of the agency.

The term "waters of the United States" according to EPA regulations includes wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs a–f of the definition of navigable waters of the United States.[10] Wetlands are defined in that same part of EPA regulations as "those areas that are inundated or saturated by surface or ground water at a frequency or duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas."

Plaintiff charges that EPA erred in determining that the repairs of the bridge that crosses Frontera Creek result in discharges of dredged material under the Clean Water Act and asserts that the bridge had been erected prior to the time in which a permit was required. It argues that it has done nothing to alter the chemical integrity of the waters its property receives from rain water and surface runoff water and that it has not polluted the waters of Caño Frontera which are highly contaminated from discharges into it by upstream industries that are in no manner associated with it. Although plaintiff expresses concern in its pretrial memorandum of December 1, 1980 over the possibility of damage to its property by the overflow of polluted waters from Caño Frontera and urges us to consider this factor in a balancing of interests, it disregards the consequences of having the polluted waters of Caño Frontera emptied into the Caribbean Sea by the effect of the pumping operations carried on in its property.

In determining whether the exhaustion doctrine is to be applied in a particular case we must take into account "the autonomy and proper functioning of the particular administrative system Congress has constructed." *McGee v. United States*, 402 U.S. 479, 484, 91 S.Ct. 1565, 1569, 29 L.Ed.2d 47 (1970); *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968). When applicable the exhaustion doctrine serves as a bar to all judicial review, for as stated in *Myers v. Bethlehem Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938), ". . . no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases where, as here, the contention is made that the administrative body lacked power over the subject matter." The exhaustion doctrine is not a rule of administrative absolutism and, as repeatedly held, it is not to be applied mechanically but rather after an assessment of the particular circumstances, the purposes and the particular administrative scheme involved. In *Federal Trade Commission v. Standard Oil Co. of California*, 449 U.S. 232, 243, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980), the Court discussed a common element present

---

**10.** 40 CFR Part 122.3 provides:

"Waters of the United States or Waters of the U. S. means:

(a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(b) All interstate waters, including interstate 'wetlands;'

(c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, 'wetlands,' sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

(1) Which are or could be used by interstate or foreign travelers for recreational or other purposes;

(2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(3) Which are used or could be used for industrial purposes by industries in interstate commerce;

(d) All impoundments of waters otherwise defined as waters of the United States under this definition;

(e) Tributaries of waters identified in paragraphs (1)–(4) of this definition;

(f) The territorial sea; and

(g) 'Wetlands' adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)–(f) of this definition."

in the exhaustion and finality doctrines, to wit, the avoidance of premature judicial intervention and interruption of the administrative process stating that "judicial intervention into the agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise. Intervention also leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." In that case the Court was confronted with respondent's charge that the Commission had issued a complaint against it under the authority of Section 5(b) of the Federal Trade Commission Act, 15 United States Code Section 45(b) without having "reason to believe" that it was violating the Act and sought an order declaring that the issuance of the complaint by the agency was unlawful. Observing that every respondent to a Commission complaint could make the claim that Socal had made, the Court warned that "judicial review of the averments in the Commission's complaints should not be a means of turning prosecutor into defendant before adjudication concludes." 449 U.S. 243, 101 S.Ct. 494. Citing the leading *McGee* and *McKart* cases, it denied immediate judicial review of agency action because of lack of finality for the same basic reasons that justify requiring exhaustion even though both concepts are distinguishable. In *Bradley v. Weinberger*, 483 F.2d 410, 415 (1st Cir. 1973) our Circuit said: "The exhaustion requirement as it applies to administrative agencies, is no mere technical rule to enable courts to avoid difficult decisions. It is grounded in substantial concerns not only of fairness and orderly procedure . . . but also of competence." (Citations omitted.) Discussing the legitimate applicability of the exhaustion rule and its exceptions, the Court in *United States v. Sweet*, 499 F.2d 259, 262 (1st Cir. 1974), noted that "the inquiry is whether the policies underlying the exhaustion requirement will not be served because of the individual fact situation." Outlining those underlying policies which justify the exhaustion requirement, our Circuit also expressed in *Laurice J. Ezratty v. Commonwealth of Puerto Rico,*

648 F.2d 770, 1981, that "the doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy." The instances in which those interests are not served constitute the exceptions to exhaustion and are set forth at page 774 of the opinion which in its pertinent part reads: "The issue may be a pure matter of law as to which specialized administrative understanding plays little role. Further agency proceedings may be futile, only delaying an ultimate resolution. Sometimes to require exhaustion will not only waste resources but also works severe harm upon a litigant." In *McKart, supra,* the Court noted that "courts ordinarily should not interfere with an agency until it has completed its action or else has clearly exceeded its jurisdiction." 395 U.S., at 194, 89 S.Ct. at 1663. The purely legal question—defined in this case as the asserted lack of jurisdiction question—and the irreparable injury exceptions are invoked by plaintiff in its argument against exhaustion.

In discussing the exhaustion problem, Professor Davis suggests a solution which involves three key factors—the extent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction. In his Administrative Law Treatise Professor Davis notes that "when the administrative proceeding involves neither abnormal expense nor other irreparable harm, and when the issue of jurisdiction is either doubtful or dependent upon specialized understanding in the agency's field, requiring exhaustion is normally desirable. When expense or other irreparable harm is great and the issue of jurisdiction is easy for the court to determine, exhaustion normally should not be required." See *Administrative Law Treatise*, Volume 3, Section 20.03 (1958).

The scope and purposes of the administrative scheme here involved were discussed at length in the case of *Milwaukee v. Illinois,* —— U.S. ——, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), where, confronted with

a preemption problem, the Supreme Court considered the Water Pollution Control Act of 1948 stating:

"The 1972 amendments to the Federal Water Pollution Control Act were not merely another law 'touching interstate waters' of the sort surveyed in *Illinois v. Milwaukee*, 406 U.S. [91] at 102–103 [92 S.Ct. 1385 at 1392, 31 L.Ed.2d 712], and found inadequate to supplant federal common law. Rather, the amendments were viewed by Congress as a 'total restructuring' and 'complete rewriting' of the existing water pollution legislation considered in that case ... Congress' intent in enacting the amendments was clearly to establish an all-encompassing program of water pollution regulation. *Every* point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goal. The 'major purpose' of the amendments was 'to establish a comprehensive long-range policy for the elimination of water pollution. No Congressman's remarks on the legislation were complete without reference to the 'comprehensive' nature of the amendments."

In another reference to the 1972 amendment, the Court, at page 4 of the opinion, observed that: "The amendments established a new system of regulation under which it is illegal for anyone to discharge pollutants into the Nation's waters except pursuant to a permit. Sections 301, 402; 33 U.S.C. sections 1311, 1342. To the extent that the Environmental Protection Agency, charged with administrating the Act, has promulgated regulations establishing specific effluent limitations, those limitations are incorporated as conditions of the permit."

■ Plaintiff's contention respecting jurisdiction is twofold. Speaking in favor of the propriety of an initial determination by this Court on agency jurisdiction it cites the cases of *Parkview Corp. v. Department of Army*, 455 F.Supp. 1350 (A.D.Wis.1978) and *P. F. Z. Properties, Inc. v. Train*, 393 F.Supp. 1370 (D.C.1975). At the outset we note that it is undeniable that a federal court may, in cases falling within one of the exceptions to the exhaustion requirement, find a particular administrative agency failing in its claim for jurisdiction. A party, however, is relieved from exhausting available administrative remedies if there is a clear absence of agency jurisdiction. In *Parkview, supra*, there was such a situation of clear lack of agency jurisdiction since it was apparent that the authority to issue compliance orders belonged to another agency, in that case EPA, and not to the Army Corps of Engineer (COE) under the statutory framework of 33 United States Code Section 1319. In that case the jurisdictional deficiency was stated in terms of the power of one agency vis a vis another. Again, *P. F. Z. Properties, supra*, stands only for the proposition, as invoked by plaintiff, that the court may decide in first instance the question of lack of agency jurisdiction. But it does not defeat defendants' contention that unless there is a clear lack of jurisdiction the party attacking the administrative order cannot evade the exhaustion requirement.

■ The facts of this case point to the probable existence of jurisdiction by EPA. Plaintiff does not dispute that its pumping operations carry the waters accumulated in its property into Caño Frontera which empties into the Caribbean Sea, thus involving navigable waters of the United States. Whether plaintiff is in fact a pollutor is a factual determination to be made during the permit procedure before the agency. As to the controversy over the existence of wetlands in plaintiff's property its own expert conceded that there are wetlands within it although limited in scope. This is contrary to the opinion of EPA's expert on wetlands who believes that most of plaintiff's property comprises wetlands and that upon ceasing the pumping operation nature restored the normal conditions of the area to wetlands that had been there historically. The exact metes and bounds of the territorial extension of the wetlands in plaintiff's property is again a factual determination to be made by the agency. However, the physical reality established by the evidence

during the hearing tends to demonstrate the existence of wetlands in plaintiff's property, the scope of which should be defined before the agency. In this case the issue of jurisdiction is dependent upon specialized knowledge in the agency's field and this, coupled with the conclusion that the agency jurisdiction is far from doubtful, leads us to conclude that exhaustion must be required. Resolution of the jurisdictional issue falls within the specialization of the agency for it requires a factual determination on how much of plaintiff's property has the physical characteristics and elements of a wetland as defined in the Act.

Finally, plaintiff has claimed that it would suffer irreparable injury by the agency's action enjoining it from further pumping water from its property until it subjects itself to the permit procedure available before the agency. Plaintiff has not shown, however, that it would be irreparably harmed if it is required to submit to that procedure. The property at this moment is dedicated only to small scale activities which produce low incomes from the rent of part of the land for grazing and the sale of coconuts. No other profitable activity is carried on nor does plaintiff contemplate any immediate development of its land which would be permanently or substantially affected if it is required to submit to the permit procedure.

The Court finds that the three factors militating in favor of exhaustion—absence of irreparable injury, apparent clarity of administrative jurisdiction and involvement of specialized administrative understanding on the question of jurisdiction—are present in this case. The prevailing interests of accuracy, efficiency, agency autonomy and judicial economy served by the doctrine are also present. In the circumstances of this case, subjecting plaintiff to the permit procedures before the agency serves best the interests of all parties concerned. As expressed in *Ludlum v. Resor*, 507 F.2d 398, 400 (1st Cir. 1974):

"We understand the desire of individuals who are dissatisfied with administrative rulings to move into another forum. In the broader aspect, however, it must be obvious that too many unnecessary applications for judicial relief may result in prompt relief for no one."

For the reasons aforestated, plaintiff's amended complaint is hereby DISMISSED.

SO ORDERED AND ADJUDGED.